United States v. Sabhnani

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2008

Argued: February 5, 2009          Decided: March 25, 2010

Docket No. 08-3720-cr(L), 08-3731-cr(CON)

_____

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

MAHENDER MURLIDHAR SABHNANI, VARSHA MAHENDER SABHNANI,

*Defendants-Appellants*.

_____

Before: WESLEY, LIVINGSTON, *Circuit Judges*, and RESTANI, *Judge*.[*]

Defendants-Appellants Mahender Murlidhar Sabhnani and Varsha Mahender Sabhnani

appeal from a judgment of the United States District Court for the Eastern District of New York

(Spatt, *J.*). Following a jury trial, both defendants were convicted on counts of forced labor,

harboring aliens, peonage, and document servitude, as well as conspiracy to commit each of the

substantive offenses, with Mahender Sabhnani receiving a sentence of 40 months' imprisonment and

Varsha Sabhnani a sentence of 132 months' imprisonment. The district court further ordered both

_____

[*] The Honorable Jane A. Restani, Chief Judge of the United States Court of International
Trade, sitting by designation.

defendants to pay substantial restitution to their victims and to forfeit their ownership interest in their home, where their victims had been held during the commission of the crimes at issue. On appeal, the Sabhnanis raise challenges to the district court's refusal to grant the defendants' request for a change of venue, its refusal to compel an independent psychiatric evaluation of a prosecution witness, its management of the presentation of witness testimony, the content of the jury instructions, the sufficiency of the evidence, the extent of the district court's inquiry into purported juror misconduct, the calculation of the applicable Guidelines sentencing range, the amount of restitution, and the scope of the property forfeiture. We vacate the district court's award of restitution to the victims and remand for recalculation of the amount. In all other respects we find Defendants-Appellants' arguments to be without merit.

Affirmed in part, vacated and remanded in part.

MONICA E. RYAN, Assistant United States Attorney (David C. James and Vincent Lipari, Assistant United States Attorneys, *of counsel*), for Benton J. Campbell, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

ALAN M. DERSHOWITZ (Victoria B. Eiger, Natham Z. Dershowitz, Amy Adelson and Daniela Klare Eliott, Dershowitz, Eiger & Adelson, P.C., New York, New York, *of counsel*), Cambridge, Massachusetts, *for Defendant-Appellant Mahender Murlidhar Sabhnani*.

SUSAN C. WOLFE, Hoffman & Pollok LLP, New York, New York, *for Defendant-Appellant Varsha Mahender Sabhnani*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendants-Appellants Mahender Murlidhar Sabhnani ("Mahender") and Varsha Mahender Sabhnani ("Varsha") (collectively "the Sabhnanis" or "appellants") appeal from judgments of the

2

United States District Court for the Eastern District of New York following a jury trial before the Hon. Arthur D. Spatt, *Senior Judge*, convicting them of two counts each of forced labor in violation of 18 U.S.C. § 1589(a), harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), holding a person in a condition of peonage in violation of 18 U.S.C. § 1581(a), and document servitude in violation of 18 U.S.C. § 1592(a), as well as conspiracy to commit each of these substantive offenses. The district court sentenced Mahender Sabhnani to 40 months' imprisonment, to be followed by a three-year term of supervised release, and ordered him to pay a $12,500 fine and a special assessment of $1200. Varsha Sabhnani was sentenced to 132 months' imprisonment, followed by a three-year term of supervised release, and was ordered to pay a $25,000 fine and a special assessment of $1200. The court also required both defendants to pay the sum of $936,546.22 in restitution to their victims, and ordered both defendants to forfeit their ownership interest in their home, where their victims had been held. The district court's forfeiture order was stayed pending the disposition of this appeal. Varsha is currently serving her sentence, and Mahender was granted bail pending appeal by this Court.

The Sabhnanis jointly and individually make numerous arguments on appeal, including: (1) improper refusal by the district court to change the venue of the trial in light of negative publicity regarding the defendants; (2) erroneous refusal to compel a prosecution witness to submit to an independent psychiatric examination; (3) incorrect instruction of the jury to the effect that it could convict Mahender Sabhnani of the charged crimes on a theory of omission as opposed to affirmative action; (4) insufficiency of the evidence as to Mahender Sabhnani's convictions; (5) incorrect instruction of the jury prohibiting it from drawing an adverse inference from the refusal of prosecution witnesses to speak to defense counsel; (6) improper refusal to recall a prosecution

witness following the completion of testimony and the beginning of jury deliberations; (7) insufficient investigation into purported juror misconduct; (8) procedural unreasonableness in Varsha and Mahender's sentencing, consisting of multiple errors in the district court's calculation of the applicable Guidelines range; (9) various errors in the calculation of the required amount of restitution; and (10) overbroad and unconstitutionally excessive property forfeiture. For the reasons that follow, we conclude that none of these challenges has merit, with the partial exception of the Sabhnanis' challenge to the calculation of the restitution award.

**BACKGROUND**

Mahender Sabhnani, a naturalized citizen of the United States born in India, lived with his wife, Varsha Sabhnani, a naturalized United States citizen born in Indonesia, in a single-family home in Syosset, New York with their four children. The jury found beyond a reasonable doubt that the Sabhnanis conspired to harbor in their Syosset home two aliens who were unlawfully in the United States — specifically, two domestic servants the couple brought from Indonesia. The jury further found that the Sabhnanis conspired to hold these two women in peonage, keeping their travel documents, and to have the aliens perform forced labor on the Sabhnanis' behalf. The jury also convicted the Sabhnanis of substantive counts of harboring, peonage, forced labor, and document servitude based upon the evidence of their mistreatment of the two women, Samirah and Enung. The evidence at the Sabhnanis' trial, viewed in the light most favorable to the government, demonstrated the following:

In 2001 and 2002, Varsha's mother, known as "Mrs. Joti," arranged for Samirah, a 53-year old woman from Indonesia, to obtain an Indonesian passport and United States visa in order to travel

to the United States to work in the Sabhnanis' home. Samirah, a rice vender who spoke no English, did not know what a visa was. She did not know how to drive a car or use an American telephone. Samirah agreed to work in the United States as a domestic servant for $200 per month. She traveled to the United States in February 2002 in the company of Mrs. Joti, who carried Samirah's passport, and Varsha's brother Naresh. Mahender and Varsha Sabhnani met them at John F. Kennedy International Airport and drove them to the couple's home. Varsha Sabhnani took Samirah's passport and other related documents and kept them until approximately April 2007, about one year after Samirah's passport had expired. Mrs. Joti returned to her home in Indonesia shortly after delivering Samirah.

Samirah worked as a domestic servant for Varsha and Mahender Sabhnani from February 2002 through May 2007, even though the visa that Mrs. Joti obtained for her authorized Samirah to enter the United States solely as Mrs. Joti's employee and to work for her in this country only until May 2002. During her time with the Sabhnanis, Samirah was responsible for cooking, cleaning, laundry, and other chores at the couple's large three-story residence, which included about seven bedrooms, seven baths, and separate offices from which Mahender Sabhnani operated PVM International and Eternal Love Parfums, the two companies that together constituted his international perfume and toiletry business.[1] Varsha told Samirah that her $200 per month salary was being paid to her daughter Lita in Indonesia. Lita was in fact paid only $100 per month. Samirah received no money herself.

The circumstances of Samirah's employment were more than severe. While at the

---

[1] The companies were principally engaged in the export of perfume, towels, body sprays and soaps to Dubai, the United Arab Emirates, Saudi Arabia, Singapore, Bahrain and other foreign markets.

Sabhnanis' home, Samirah, who had slept in her own bed at home in Indonesia, was required to sleep first on the carpet outside the bedroom of one of the children and then on a mat on the floor of one of the residence's kitchens. Samirah was not given adequate food to eat — to the point that she was often forced by hunger to eat from the garbage. She worked for extremely long hours per day and was often deprived of sleep. On one occasion in 2003, William Hespeler, an electrician performing work at the home, observed Samirah dressed in "raggedy clothes," following Mahender Sabhnani as she carried a food and beverage tray. Tr. 3586. Her meager dress that day was not atypical. Indeed, beginning around March 2007, Varsha Sabhnani refused to provide Samirah with even the semblance of adequate clothing, requiring her to wear tattered sweat pants and a top made from old rags and the cut remnants of a dress. Various witnesses testified that Samirah wore "torn or tattered," "messy" clothing, rags "used for cleaning the floor" and clothing that left her "private part . . . visible." Tr. 1786, 3834.

Samirah was subjected to extremely harsh physical and psychological treatment in the Sabhnanis' home. On one occasion sometime before 2005, for example, Samirah drank milk directly from a container, without using a glass; the incident was reported to Varsha Sabhnani by one of her daughters. Varsha responded by beating Samirah and pouring scalding hot water on her arm. At her mother's instruction, one of Varsha's daughters took a photograph of Samirah with the milk container. Varsha Sabhnani told Samirah that the photo would be sent to Samirah's family in Indonesia to prove that Samirah was a thief. The photo, which Varsha thereafter kept in a locked cabinet in a closet adjoining the Sabhnanis' bedroom, was introduced into evidence at the trial. It depicts the discoloration on Samirah's arm from the scalding.

The milk incident was not an isolated one. Samirah was beaten by Varsha Sabhnani with

various household objects, such as a broom, an umbrella, and a rolling pin. She was punished for sleeping late, for not receiving permission to throw out the garbage, for stealing food from the trash, and for failing to clean the garage. Varsha threw boiling water on Samirah on at least three separate occasions. She also mutilated Samirah, pulling on Samirah's ears until they bled, causing scabs and scars, and cutting Samirah with a knife, leaving scars on her face and various parts of her body. Wearing plastic supermarket bags on her hands, Varsha Sabhnani on more than one occasion pulled on Samirah's ears and dug her fingernails into the flesh behind them, causing blood to trickle down Samirah's neck. She punished Samirah for various alleged misdeeds by forcing her to eat large quantities of hot chili peppers until Samirah vomited or moved her bowels uncontrollably. Varsha forced Samirah to walk up and down flights of stairs many times in succession. Samirah was required to bathe several times in a row, sometimes with her clothes on, and was not infrequently made to work while wearing wet clothing. Varsha Sabhnani also cut Samirah's hair with scissors and shaved her pubic hair, threatening Samirah that if she resisted her children in Indonesia would be murdered by Mahender Sabhnani and by the couple's teenage son. Samirah "never fought back," according to her own testimony, "because [Varsha Sabhnani] always said, mind you, if you fight me off, then you [will] be killed by the mister," referring to Mahender Sabhnani. Tr. 1774. The abuse suffered by Samirah caused her to become so fearful that she would sometimes urinate on herself.

On at least three occasions, Varsha Sabhnani forced Samirah to write letters to Samirah's family in Indonesia that Varsha dictated and then took from Samirah and kept. These letters contained statements to the effect that Samirah was a "crazy person," that she walked around naked, urinated and defecated on herself, and wished to die. Tr. 2360. They also contained a statement that, when translated, was interpreted to mean that Samirah purported to curse or cast a spell on her son,

7

Erwin, who was deceased. Varsha threatened to send these letters to Samirah's family in Indonesia, but she actually kept them in the same locked cabinet in the closet adjoining the Sabhnanis' bedroom that contained Samirah's photograph with the milk container, as well as her passport and related documents.

Subject to this recurrent abuse, Samirah often asked to return to Indonesia or to be "give[n] . . . away" to another person. Tr. 1881. When she did so, Varsha Sabhnani told her that she would have to pay money to make up for the expenses the Sabhnanis had incurred in bringing her to the United States. Varsha told Samirah that Samirah's children would be killed if she escaped. Varsha also threatened Samirah that if she ran away, Varsha would falsely report to the police that Samirah had stolen food and jewelry and by this means have Samirah sent to prison.

Most of Samirah's day-to-day supervision came from Varsha Sabhnani, who ran the Sabhnanis' household and also spoke Indonesian, Samirah's native language. However, Samirah served not only Varsha, but also Mahender Sabhnani, who often scolded her and who at least on occasion directly required Samirah to undertake various jobs, including cleaning the bathroom in his office. Samirah testified that one of the Sabhnanis' daughters "maybe . . . [felt] pity" for her and intervened on her behalf one day after Samirah was hit with a telephone, telling her mother that she would watch Samirah eat a raw chili pepper but then helping Samirah to throw it away. Tr. 1821. Mahender Sabhnani, in contrast, reported on Samirah's supposed misdeeds to his wife:

> Q. Did you sometimes get punished for things that you did that the Missus didn't see you do?
> A. Yes.
> Yes. The Mister would report to the Missus that I slept in the bathroom upstairs and the Missus would immediately hit me.

Tr. 1848.

Mahender informed Varsha Sabhnani on one occasion that he had seen Samirah eating food from the garbage and on at least one other that he had found Samirah sleeping in a bathroom.[2] These incidents resulted in Varsha's physically abusing the maid. Insofar as the record reveals, Mahender Sabhnani was not present on the occasions of Varsha Sabhnani's most violent physical abuse. He was present, however, when Samirah was forced to wear dripping wet or grossly inadequate clothing that left her body exposed. He saw his wife tear paper on which she had forced Samirah to write into small pieces and then throw it on the floor, only to require Samirah to pick the pieces up, one by one. Moreover, various marks on Samirah's body resulting from Varsha's maltreatment, as well as Samirah's swollen and mutilated face, were clearly visible to Mahender Sabhnani during the time Samirah lived in his home and served him.

In late 2004 and early 2005, the Sabhnanis acquired the services of Enung, another woman from Indonesia. Forty-seven years old, Enung, who had completed only the first grade and who, like Samirah, spoke no English, was also recruited by Mrs. Joti. A sister of Varsha's, Kareena Deepak Kirpalani, trained Enung at Kirpalani's residence in Indonesia and, along with Mrs. Joti and Kirpalani's husband, helped Enung acquire the necessary travel documents to come to the United States. Enung's I-94 Departure Form authorized only a brief stay of no more than six months. Nevertheless, Enung began work for the Sabhnanis immediately upon her arrival in the United States. She was met by Varsha and Mahender Sabhnani at the airport in January 2005. Varsha took Enung's passport and related travel documents and kept them in the same locked cupboard in the closet adjacent to the Sabhnanis' bedroom in which she also kept Samirah's passport and related

---

[2] In this instance, Samirah, who was washing an upstairs bathroom, fell asleep. Mahender told Varsha that Samirah "was not washing," but that "she was sleeping in the bathroom." Tr. 1869.

documents, the photo of Samirah with the milk container, and the letters Samirah was required to write. Enung's passport remained there until discovered by law enforcement agents in May 2007, nearly two years after Enung was required to depart the country and two-and-one-half years after she began work for the Sabhnanis.

Enung, like Samirah, testified that she was made to work lengthy hours — from about 4:00 or 5:00 A.M. until late at night, seven days a week — and that she was generally denied food, sleep, and even medical care when sick or injured. Both Samirah and Enung testified to numerous occasions on which they were driven by hunger to eat food from the trash.

Enung was also a witness to Samirah's maltreatment at Varsha Sabhnani's hands — maltreatment that appears to have worsened during the period after Enung's arrival. Enung observed Varsha hit Samirah with various household implements, pull on Samirah's ears, and throw hot water on her. She, like Samirah, testified that Samirah was required to wear eyeglasses with tape and plastic obscuring the lenses. Enung was present on many occasions when Varsha Sabhnani forced Samirah to eat whole raw chili peppers or chili powder mixed with salt, often until Samirah became violently ill. On one occasion Samirah refused to eat chili peppers. Varsha Sabhnani first threatened to have her drink cleaning fluid and then required her to take off her clothes and stand naked while Enung put tape on Samirah's body and ripped it off, causing Samirah to scream in pain.

Enung herself was not immune from these more atrocious forms of abuse. Varsha Sabhnani forced Enung to walk up and down stairs repeatedly as punishment for supposed misconduct. She required Enung to cut up her own clothing. On one occasion, after Enung was accused of stealing two pieces of chocolate, she was forced to stand in one place for approximately ten hours — from early in the morning until about 4:00 in the afternoon. Varsha and Mahender Sabhnani, as well as

10

their son, laughed at her while she was being punished in this manner. On another occasion when Varsha Sabhnani was cooking, Enung handed her the wrong spice. Varsha hit Enung in the face with a metal spoon, causing Enung's face to bleed and leaving a scar. Varsha also struck Enung with her fist and with a glass Pyrex cooking dish.

The Sabhnanis left the country for about two months each summer. So far as the record shows, the maids did not leave the residence or otherwise attempt to escape during these periods. Varsha told Enung that if she ran away, the police would shoot her. She also threatened that if Enung left, Enung's husband in Indonesia, who had received advance payment for Enung's services, would be arrested. During at least one of these summer absences, the Sabhnanis' large refrigerator was chained shut. The Sabhnanis on more than one occasion failed either to leave adequate food for the maids or to arrange for its provision. Samirah and Enung begged for food in these instances from both Deborah Litras, who worked for Mahender Sabhnani as the export manager of his businesses, and Anthony Pascarella, the Sabhnani's gardener, both of whom had brief contact with the maids on a few occasions and both of whom testified at trial.

In addition to providing the maids with food, Litras also mailed several letters on their behalf. After receiving the first of these letters, posted in July 2006, from the maids, Litras obliterated the return address on the envelope, concerned that if the letter was returned to the Sabhnanis, "that it might present a problem" for the maids, and she "really didn't want them to be in any kind of trouble if this was something that they weren't supposed to be doing." Tr. 3855. After posting this first letter on their behalf, Litras thereafter saw the maids only rarely: "Then I didn't see them ever, outside, by a shed, or else anything. I started noticing that I was never seeing them at all." Tr. 3858.

The letter posted in July 2006 was received by Samirah's children in Indonesia and was

introduced at trial. In it, Samirah inquired after her children and pleaded for their help: "[Y]ou must do the midnight prayers if you want your mother to live and be together with you again." Tr. 2055. She informed them that she was being tortured, not allowed to eat or sleep, that she was forced to take repeated baths, and that she was not permitted to wear adequate clothing in the cold. She stated, "I don't have the strength to work here anymore." Tr. 2052. Samirah asked her children to pray for her return and also to seek out a witch doctor to cast a spell "so that the Missus would send me home and pay for it." Tr. 2055. She advised her daughter, Lita, to seek her return by contacting Varsha Sabhnanis' relations, but not to disclose the true reason:

> Lita, don't say that your mother told you of being tortured, denied food, deprived of sleep, told to take a bath 30 times, clothes are torn to shreds, not allowed to wear double clothing in the winter. Lita, just say this, the children are grown, and working. So it's my turn to rest.

Tr. 2056. Samirah testified that she gave these instructions "[b]ecause if the Missus found out" she was complaining to her children, she would "get beat up some more."[3] Tr. 2062.

Samirah and Enung approached Litras again in April 2007, some nine months after this letter was posted, when Litras was alone in Mahender Sabhnani's office and the Sabhnanis were not at home. The maids were "disturbed and rushed," "[u]pset." Tr. 3861. They came in together and threw raw chili peppers on the ground. Using gestures, they appeared to communicate that they were forced to eat them. Samirah, whose hair Litras described as "chopped up," showed Litras a large

---

[3] After receiving the letter, Lita and Leo, one of Samirah's sons, approached Mrs. Joti seeking to have Samirah returned to Indonesia. Mrs. Joti told them that they would have to wait until Samirah's "contract" had expired, Tr. 2557, and told them that they would have to pay 40 million rupiahs, or approximately $4400. During one of several telephone conversations between Mrs. Joti and Leo, Mrs. Joti falsely told him that his mother was in Los Angeles. On another occasion she told him that his mother was "doing well" in America. Tr. 2732. In her third conversation with Leo, Mrs. Joti became angry and told Leo, who testified at trial, that she could have Samirah murdered.

gash behind Samirah's right ear and a bruise below her left shoulder. Tr. 3863. According to Litras, "[t]he language barrier was very difficult," but the maids appeared to act out a scenario in which one maid was hit with an object and then was made to hit the other. Tr. 3874. Both maids were crying. Samirah and Enung provided Litras with another letter, which she also posted, resolving to herself that she "had to try to find out what was happening here." Tr. 3874. A few weeks later, on a morning on which Mahender Sabhnani was present in the office, Litras saw Samirah crouching at the office door that led down to the basement with blood dripping from her hairline. Litras gestured Samirah away so that Mahender Sabhnani would not see her.

Finally, on the evening of May 12, 2007, Samirah, who had been beaten about the face by Varsha in the preceding days and who testified that she was fearful she would soon be killed, ran away from the Sabhnanis' house carrying the expired Indonesian passport that Varsha had returned to her the previous month. Samirah entered a Dunkin' Donuts store in Syosset early the next morning. The people inside the Dunkin' Donuts were unable to communicate with Samirah because she did not speak English, but Samirah attempted to tell them of her plight. Witnesses testified that Samirah showed them the marks, bruises, cuts, and scars on her face and arms and made gestures as if she were pinching or slapping herself. A security videotape introduced at trial captured Samirah motioning towards her ears and pointing out her other injuries. The mother of the store manager, a certified nursing assistant, saw the wounds behind Samirah's ears and the marks on her forearms and told her son to call the police. Samirah was taken to the Nassau University Medical Center, where her treating physician diagnosed "[m]ultiple physical abuse." Tr. 2874. Doctors and nurses treated her ear wounds, which were infected, and Samirah, through an interpreter, told her treating physician about the abuse she had suffered. Police officers recovered from Samirah her passport,

13

as well as a plastic bag Samirah had taken with her when she fled the Sabhnani's house, containing a piece of paper with Varsha's name and address on it, a number of other papers, and a single chili pepper. Police took a number of photographs of Samirah's injuries, including pictures of her ears, face, forearms, chest, neck, and back, which were admitted into evidence during the trial.

In the course of the resulting investigation, agents from Immigration and Customs Enforcement ("ICE") executed two search warrants at the Sabhnanis' home. During the first search, Varsha and one of her daughters told Enung to run away and hide, and agents discovered her in a small closet underneath the basement stairs. Enung provided agents with a knife stained with Samirah's blood and tissues; both of these Enung had secreted away on Samirah's departure. Enung also showed agents a broom and rolling pin with which Varsha had beaten Samirah, and gestured to the agents that this was their use. Agents also found a blood stain on the door leading from the basement to Mahender Sabhnani's office — the location at which Litras testified that she had observed Samirah crouching, with blood dripping from her hairline. DNA testing confirmed that the blood found on the door was Samirah's.

Agents also discovered that the Sabhnanis had placed dead bolt locks on the outside of both doors to the basement bathroom. This bathroom was used solely by Samirah and Enung. Samirah testified that at the time the locks were installed, Varsha told her that she intended to lock Samirah up in the bathroom because she was expecting a guest from the Indies and was embarrassed about having someone in her home "who [didn't] look good." Tr. 2272. Enung testified that Varsha threatened to lock Samirah in the bathroom with no food and to give both maids an "injection" there that would "dry up the blood" or make them "go crazy." Tr. 3245. Enung testified that she was rendered so fearful by virtue of this threat that she couldn't eat.

14

The Sabhnanis were arrested on May 14, 2007 on charges of committing forced labor. In a superseding indictment filed September 18, 2007, the Sabhnanis were charged with the following crimes: (1) two counts of forced labor or attempted forced labor in violation of 18 U.S.C. §§ 1589(a) and 1594(a);[4] (2) one count of conspiracy to commit forced labor in violation of 18 U.S.C. §§ 371 and 1589(a); (3) two counts of harboring aliens or attempting to harbor aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(II);[5] (4) one count of conspiracy to harbor aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (v)(I); (5) two counts of peonage or attempted peonage in violation of 18 U.S.C. §§ 1581(a) and 1594(a);[6] (6) one count of conspiracy to commit peonage in violation of 18 U.S.C. §§ 371 and 1581(a); (7) two counts of document servitude in violation of 18 U.S.C.

---

[4] 18 U.S.C. § 1589 provides in relevant part as follows:

(a) Whoever knowingly provides or obtains the labor or services of a person by . . . means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person . . . shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a). Section 1594(a) prohibits attempting to commit forced labor, peonage, and document servitude, among other offenses.

[5] 8 U.S.C. § 1324(a)(1)(A) makes criminally liable any person who:

[K]nowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection . . . such alien in any place, including any building or any means of transportation . . .

8 U.S.C. § 1324(a)(1)(A). Section 1324(a)(1)(A)(v)(II) prohibits aiding and abetting a violation of § 1324(a)(1)(A). Section 1324(a)(1)(A)(v)(I) prohibits conspiracy to commit the substantive offenses.

[6] 18 U.S.C. § 1581(a) prohibits "hold[ing] or return[ing] any person to a condition of peonage . . ." 18 U.S.C. § 1581(a).

15

§§ 1592 and 1594(a);[7] and (8) one count of conspiracy to commit document servitude in violation of 18 U.S.C. §§ 371 and 1592. A seven-week trial followed; the evidence at trial consisted of testimony from many witnesses, including Samirah, Enung, Hespeler, Litras, Pascarella, Samirah's relatives from Indonesia, Samirah's treating physician, and law enforcement agents, as well as physical evidence recovered from the house and numerous photographs.

The defense case consisted primarily of the testimony of visitors to the residence who observed the maids and noted nothing unusual. During summation, counsel for both Varsha and Mahender Sabhnani contended that Samirah's and Enung's testimony could not be believed, and that, despite her denials, there was reason to believe that the marks on Samirah's body were the product of kerokan, an Indonesian folk remedy practiced by Enung that involved rubbing a hard object on the skin. Defense counsel suggested that Samirah was consumed with hatred of Varsha Sabhnani because she believed Varsha had cast a spell on her adult son, Erwin, who died in 2006, while Samirah was working for the Sabhnanis. Seeking financial reward, Enung supposedly manipulated Samirah's mental state to the point that Samirah was willing to testify about abuses that never occurred, while Enung falsely corroborated her story. Following the trial, both Varsha and Mahender Sabhnani were convicted on all counts.

---

[7] 18 U.S.C. § 1592 provides:

Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . in the course of a violation of [§§ 1581, 1589, and 1594(a)] [or] with intent to violate [§§ 1581, 1589, and 1594(a)] . . . shall be fined under this title or imprisoned . . . .

18 U.S.C. § 1592.

## DISCUSSION

## I. Pretrial Motions

### A. The Venue Motion

Appellants contend that the district court improperly denied their motion pursuant to Fed. R. Crim. P. 21(a) for a change of venue. We review the district court's disposition of such a motion for abuse of discretion. *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990). Rule 21(a) provides in relevant part that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). The defendant must show "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *Maldonado-Rivera*, 922 F.2d at 966-67 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966) (internal quotation marks omitted)). "In assessing the motion, the district court may take into account, *inter alia*, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on the likely effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially." *Id.* at 967.

The Sabhnanis contend that the prosecution generated prejudicial pretrial publicity during bail hearings on May 15 and 17, 2007. In the course of the bail proceedings, the government described the charged crimes as involving "incomprehensible brutality and violence and inhumanity." The local news media printed and broadcast stories about the matter, several of which repeated the prosecution's statement that this was a case of "modern day slavery." The tabloid

newspapers dubbed Varsha "Cruella," after the Disney villain Cruella de Vil, and printed details of the methods that the Sabhnanis allegedly used to torture their victims. During the weeks following the bail hearings, in which there was a significant amount of litigation over the bail conditions, *see United States v. Sabhnani*, No. 07-CR-429, 2007 WL 2769487, at *1-2 (E.D.N.Y. Sept. 21, 2007) (order denying transfer motion), the media reported on various developments in the case, continually referring to it as the "Slave Case." The coverage also repeatedly referenced the Sabhnanis' wealth and the value and size of their home.

We conclude that the district judge did not abuse his discretion in denying the Sabhnanis' motion to transfer venue. First, we agree with the district court that the prosecution's statements regarding the character of the crimes were proper in the context in which they were made: bail hearings in which the prosecutors were arguing that the Sabhnanis were a danger to the victims and their families, justifying an order of pretrial detention. The prosecution's mention of the Sabhnanis' wealth was likewise proper in the context of arguing that the Sabhnanis were a risk of flight due to their substantial means. While a district court may consider the government's role in generating adverse publicity in deciding a motion for change of venue, legitimate advocacy at a court proceeding — even advocacy resulting in adverse pretrial publicity — does not constitute conduct for which the government is properly held responsible in a Rule 21(a) inquiry. Nor do we find any error in the district court's determination that, in any event, the press coverage appears to have been driven at least as much by comments of the Sabhnanis' counsel as by any prosecutor's statement. *See Sabhnani*, 2007 WL 2769487, at *3 & nn.4-6.

Second, we similarly conclude that the pretrial publicity here was not so pervasive and prejudicial as to have created a reasonable likelihood that a fair trial could not be conducted. The

18

bail hearings took place in mid-May, and voir dire in the case began in late October, five months later. This is a shorter amount of time than has been present in some cases in which we have noted that the effects of publicity had dissipated by the time the trial began. *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003). However, in *Maldonado-Rivera*, we affirmed the denial of a motion to transfer venue even though the district judge there found that the press coverage was "continuing and prominent." *Maldonado-Rivera*, 922 F.2d at 967 (describing district court's finding of "slightly more than one article per week over a three-year period). Moreover, the record here indicates, as the district court found, that most of the press coverage tracked the frequent court proceedings in this case. *See, e.g.*, Varsha App. 10-11 (first appearance), 14-15, 22 (second bail hearing), 28-30 (indictment), 33-65 (litigation over bail conditions). Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change.

Most importantly, the cases involving claims that pretrial publicity was so inherently prejudicial that a fair trial in the district could not be had draw a clear distinction between mere exposure to pretrial publicity and actual prejudgment by the venire of the issues to be decided in the case. "We must distinguish between mere familiarity with petitioner or his past and an actual predisposition against him . . . . To ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community . . . ." *Murphy v. Florida*, 421 U.S. 794, 800 n.4 (1975). It is true that the Supreme Court has in the past stated that publicity can so saturate a community (and be so highly prejudicial to the defendants) that courts should in such cases presume a fair trial was impossible. *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 724-26 (1963) (defendant

19

was filmed, possibly without his knowledge, confessing to details of crime, and film was shown repeatedly on television in relatively small community); *see also Patton v. Yount*, 467 U.S. 1025, 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed.") (describing the holding of *Irvin v. Dowd*, 366 U.S. 717 (1961)). Cases presenting this scenario are very rare, however, and have been characterized by our sister circuits as "extreme situation[s]," *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc) (upholding rejection of motion to transfer venue of accused Cuban spies from Miami despite alleged pervasive prejudice against the Cuban government in the district), in which the "publicity in essence displaced the judicial process." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998).

The Sabhnanis argue that we need not employ a presumption of prejudice here because there is actual evidence that the venire was biased. The record, however, does not establish that the venire had prejudged the Sabhnanis' case, and nothing argued to the district court or to this court suggests anything to the contrary. The Sabhnanis point to the voir dire and, in particular, to the responses to questioning by some potential jurors as evidence that these jurors, who were excused, had been biased against them by the media coverage.[8] They also point to an e-mail sent to the court by an excused potential juror, who claimed that other members of the venire were "lying" and pretending to "live in a cave" in order to serve on the jury in the case. Varsha App. 129-30.

---

[8] We do not understand the appellants to be arguing that the trial jury, as opposed to the venire, was prejudiced by the media coverage. To the extent their arguments can be so construed, they were soundly rejected by the district court in its decision on the Sabhnanis' Rule 33 motion on the ground that the Sabhnanis could not demonstrate that any juror was actually exposed to prejudicial publicity. The appellants make no arguments here to demonstrate that this conclusion was erroneous in any respect.

20

We have noted, in the context of the appeal from a conviction involving crimes far more notorious than the ones in this case, that "the key to determining the appropriateness of a change of venue is a searching voir dire." *Yousef*, 327 F.3d at 155. Here, as in *Yousef*, the Sabhnanis did not renew their motion to change the trial's venue directly after the jury's voir dire, nor do they object here to the voir dire's sufficiency. Moreover, in seeking a new trial before the district court post-verdict, although Varsha did point to adverse publicity, she never contended that the voir dire itself was deficient in any respect. *See id.* (taking such silence as an "indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity"). The evidence the Sabhnanis point to establishes no more than that some members of the venire had been exposed to publicity, and that some may have been reluctant to admit it. We have rejected claims that the venire was not sufficiently impartial in cases in which the evidence that excused potential jurors had formed an opinion of the defendant's guilt or innocence based on pretrial publicity was far more substantial. *See, e.g.*, *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (finding no manifest error in state court's determination that jury was impartial when defendant argued that 83% of veniremen were excused because they had prejudged the case); *see also United States v. Higgs*, 353 F.3d 281, 308-09 (4th Cir. 2003) (affirming denial of motion to transfer venue in which majority of potential jurors had heard about the case and several stated that they had formed an opinion based on publicity). Here, neither the character of the publicity nor the extent to which potential jurors were either exposed to it or affected by it warrants the conclusion that a presumption or inference of generalized prejudice was appropriate in this case. We conclude that the district court's denial of the motion for a change of venue was not an abuse of discretion.

**B. The Motion for a Psychiatric Examination**

21

Appellants next assert that the district court erred in denying their motion for a psychiatric examination of Samirah. The motion was based on: (1) the affidavit of Dr. Barent Walsh, a clinical social worker providing therapy to "self-injuring persons," which stated, based on Dr. Walsh's examination of photographs of Samirah's injuries, that although he could not be certain since he had never seen her, the photographs showed injuries that could "be consistent with self-injury," Varsha App. 251; (2) Samirah's discharge papers from the Nassau University Medical Center, which noted that she was being referred to an "outpatient psychiatry clinic"; and (3) the affidavit of one of the appellants' daughters which stated that she had frequently observed Samirah behaving in a "strange fashion" (for instance by urinating uncontrollably), and that she had heard Samirah state after the death of her son, Erwin, that she "deserve[d] to be punished." Varsha App. 246-47. The Sabhnanis also relied on letters written by Samirah that contained what they argued to be further evidence of Samirah's possible mental instability. Judge Platt denied the motion, which the defense renewed shortly prior to trial before Judge Spatt.[9] At that time, the defense also relied on the deposition testimony of Samirah's daughter Lita regarding information that Varsha Sabhnani had provided to her about Samirah's behavior. Judge Spatt denied the renewed motion.

"Ordering a witness to undergo a psychological examination is a drastic measure." *United States v. Russo*, 442 F.2d 498, 503 (2d Cir. 1971); *see also United States v. Kehoe*, 310 F.3d 579, 592 (8th Cir. 2002). Given the "inherent problems in allowing psychiatric examination of a witness," including "invasion of privacy, limiting availability of witnesses, [and] chilling testimony," *United States v. Gates*, 10 F.3d 765, 766 (11th Cir. 1993), a court should exercise its discretion to require

---

[9] This matter was originally assigned to Judge Thomas C. Platt, and was reassigned to Judge Spatt shortly before trial.

such examinations only sparingly. Here, the Sabhnanis do not claim that Samirah was incompetent to testify, but only that the district court abused its discretion by failing to allow the defense to gather evidence of Samirah's psychological state that could have been used to impeach her credibility. We conclude that this argument is without merit.

In *Russo*, where we rejected the argument that a purported "pathological liar" should have been required to undergo an independent psychiatric exam, we noted that so long as "the jury from its observation has the opportunity to appraise the credibility of the witness in the light of the facts impugning his veracity, this constitutes the constitutional safeguard of a defendant's rights." 442 F.2d at 502. This precept is fully applicable here. The jury had a full opportunity in this case to assess Samirah's credibility, and a psychiatric examination would not have added measurably to its ability to do so. Samirah testified for part or all of six days, and faced extensive cross-examination.[10] The Sabhnanis argue that because Samirah's testimony was given through an Indonesian interpreter the jury was unable to assess her tone of voice. Even assuming this to be case, however — a matter on which we express no opinion — the fact that Samirah's testimony was conveyed to the jury through the medium of an interpreter did not measurably lessen the jury's ability to assess other aspects of her testimony, such as the content of her statements, her body language, and her facial expressions. *Cf. Vasquez v. Kirkland*, 572 F.3d 1029, 1038 (9th Cir. 2009) (testimony by deaf-mute through two separate sets of interpreters did not deprive defendant of opportunity to cross-examine witness; jury could assess credibility because witness testified under oath and jury could observe her demeanor). The Sabhnanis also point to Samirah's testimony that Varsha Sabhnani put a spell on

---

[10] The jury also heard testimony from Samirah's treating physician at Nassau University Medical Center, Dr. Ami Attali, who testified regarding Samirah's mental state while at the hospital.

23

Samirah's son Erwin as evidence of Samirah's unstable mental condition. That the jury heard this testimony, however, only further undermines any claim that a psychiatric examination was needed to assist the jury in evaluating Samirah's state of mind.

We conclude that the district court acted well within its discretion in determining that the evidence proffered by the appellants in support of their motion was insufficient to show the need for a psychiatric exam. Dr. Walsh's affidavit, based only on a review of photographs, indicated merely that Samirah's injuries might "be consistent with self-injury" — an assertion that fell well short of demonstrating any mental instability, much less mental instability warranting the conduct of a psychiatric examination. *Cf. United States v. Gutman*, 725 F.2d 417, 420 (7th Cir. 1984) (finding no abuse of discretion in the district court's refusal to hold a hearing to determine whether a witness with a history of mental illness was competent to testify). Similarly, Samirah's letters, most of which Samirah testified Varsha dictated to her and forced her to write, did not demonstrate the need for investigation into Samirah's mental state and, in any event, were themselves available for assessment by the jury. The hospital discharge papers noting Samirah's referral to an outpatient psychiatric clinic do not explain the reason for the referral, but Dr. Attali testified that such a recommendation is routine for most recovering trauma victims. The district court did not abuse its discretion by declining to afford these notes much weight. Finally, neither the Sabhnani daughter's affidavit attesting to Samirah's "strange" behavior — much of it, according to Samirah's later testimony, caused by the Sabhnanis' mistreatment — nor the deposition testimony of Samirah's daughter, which merely reported Varsha Sabhnani's self-serving statements, established a compelling need for Samirah's examination. The district court did not err, much less abuse its discretion, in determining that a psychiatric examination was not warranted.

24

## II. Mahender Sabhnani's Jury Instruction and Sufficiency Challenges

Mahender Sabhnani raises two claims of error with regard specifically to his convictions. First, he contends that the charge to the jury on aiding and abetting erroneously allowed the jury to convict him on an omissions theory of liability, rather than on any affirmative acts he might have taken to aid and abet his wife's criminal conduct. This error, he contends, infected every count on which he was convicted and requires that all of his convictions be vacated. Second, he contends that the evidence was insufficient to sustain the convictions on any of the twelve counts on which the jury convicted him. We disagree with both claims.

### A. Mahender Sabhnani's Jury Instruction Challenge

The government charged both defendants under the aiding and abetting statute, 18 U.S.C. § 2, as well as under the specific substantive statutes at issue. Mahender Sabhnani asserts error in approximately forty words in Judge Spatt's 792-word instruction on aiding and abetting. In particular, he contends that the district court's instruction on willfulness permitted the jury to convict him for failing to act.[11] Because none of the statutes pursuant to which he was charged predicates liability on a failure to act, he argues, and because no common law duty to act is at issue in this case, or was part of the jury charge, this instruction was erroneous, requiring his convictions to be vacated. For the following reasons, we disagree.

---

[11] The instruction, which was given twice, reads in its entirety as follows:

> Participation in a crime is willful if action is taken voluntarily and intentionally or in the case of a failure to act with the specific intent to fail to do something the law requires to be done, that is to say, with a bad purpose either to disobey or to disregard the law.

Tr. 5035.

25

A defendant challenging a jury instruction as erroneous must show "both error and ensuing prejudice," *United States v. Quinones*, 511 F.3d 289, 313-14 (2d Cir. 2007), and we review the jury instructions "de novo . . . viewing the charge as a whole," *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)). "De novo review leads us to [find] error if we conclude that a charge either fails to adequately inform the jury of the law, or misleads the jury as to the correct legal standard." *Id.* (quoting *United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997)) (alteration in original) (internal quotation marks omitted). We emphatically do not review a jury charge "on the basis of excerpts taken out of context," but in its entirety, *see United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003) (quoting *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir. 1998)) (internal quotation marks omitted), to determine whether considered as a whole, "the instructions adequately communicated the essential ideas to the jury." *United States v. Tran*, 519 F.3d 98, 105 (2d Cir. 2008) (quoting *United States v. Schultz*, 333 F.3d 393, 413-14 (2d Cir. 2003) (internal quotation marks and alterations omitted)); *see also Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").

At the start, we find dubious the government's claims that aiding and abetting liability may generally be predicated upon a failure to act unconnected to any legal duty to do so, that the statutes at issue created an affirmative duty to act, or that Mahender Sabhnani was properly found by the jury to have violated a common law duty that required him to act. It is a long-established principle that criminal law generally regulates action, rather than omission, and that "[f]or criminal liability to be based upon a failure to act it must first be found that there is a duty to act — a legal duty and not

26

simply a moral duty." 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.2 (2d ed. 2008).[12]  This general principle, that omissions may serve as the basis of criminal liability only if there is an affirmative duty to act, is equally applicable when the crime charged is aiding and abetting.  *See United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990) ("To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime.").  Here, none of the statutes pursuant to which Mahender was convicted expressly impose an affirmative duty to take action, lest a crime be committed.[13]  And even assuming, *arguendo*, that Mahender Sabhnani owed a common

------

[12] Such a legal duty to act can arise from a statute specifically creating the duty — the duty to file one's tax returns, for instance, *see* 26 U.S.C. § 7203 — or by extrapolation from a different statute, the common law, or contract.  1 LaFave, *Substantive Criminal Law* § 6.2.

[13] The document servitude statute, 18 U.S.C. § 1592, which criminalizes the knowing destruction, concealment, removal, confiscation, or possession of immigration documents of another, may come the closest — predictably enough, as criminal possession statutes often straddle the line between regulating an act and an omission.  *See* Sanford H. Kadish et al., *Criminal Law and Its Processes: Cases and Materials* 207 (8th ed. 2007).  We have held that constructive possession — established by a showing that "a defendant knowingly had the power and the intention at a given time to exercise dominion and control over [an item]" — can be sufficient to render a defendant criminally liable under such a statute.  *United States v. Chavez*, 549 F.3d 119, 129 (2d Cir. 2008) (quoting *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001)) (internal quotation mark and alteration omitted) (constructive possession of a firearm was sufficient for a conviction under 18 U.S.C. § 924(c)); *see also United States v. Jones*, 531 F.3d 163, 168-69 (2d Cir. 2008) (constructive possession of narcotics was sufficient for a conviction under 21 U.S.C. § 841(a)(1)).  Under this definition of constructive possession, one could violate § 1592 by forming the specific intent to possess the immigration documents of another while having knowing control over them — in theory, without taking any affirmative act.  Even accounting for this possibility, however, possessory offenses do not expressly impose affirmative duties to act in the manner of traditional omissions statutes, which, in effect, require affirmative conduct to be taken to avoid commission of the crime.  *See, e.g.*, 18 U.S.C. § 2250(a) (knowing failure to register or update a registration as a sex offender by one who is required to do so); 50 U.S.C. § 462 (failure to perform a duty of registration by one required to do so under the Military Selective Service Act).

law duty to the maids that was sufficiently well established in our legal tradition and practice that it constitutes part of the background common law against which these statutes should be interpreted, *see, e.g., Morisette v. United States*, 342 U.S. 246, 250 (1952); *United States v. Rybicki*, 354 F.3d 124, 135-36 (2d Cir. 2003) (en banc), the jury here was not charged on the nature of this duty nor instructed as to the factors it should consider in determining whether the duty was discharged. *See Jones v. United States*, 308 F.2d 307, 310-11 (D.C. Cir. 1962) (reversing on plain error review where a jury was not instructed as to the nature of the common law duty that was the basis for omissions liability).

We need not decide the question whether in the circumstances of this case Mahender Sabhnani could properly be convicted based upon an omission to act, however, because we reject his claim that the district court's instruction on willfulness, considered in the context of the aiding and abetting instruction as a whole, rendered the instructions so confusing as to permit the jury to convict him on this basis. To be clear, the jury was instructed that participation in a crime is willful if action is taken voluntarily and intentionally, or in the case of a failure to act, with specific intent to fail to do something the law requires. Drawn nearly verbatim from the model jury instruction in the leading treatise on the subject, *see* 1 Leonard Sand et al., *Modern Federal Jury Instructions —Criminal*, ¶ 11.01, at 11-4 (2008 ed.), this instruction was not inaccurate, however, but simply extraneous to this case — at least absent further instruction as to a legal theory that would support liability based on a failure to act.

When a jury charge contains language that could potentially confuse the jury as to the applicable law, we look to see whether the charge as a whole adequately instructed the jury as to the applicable legal standard. *Cupp*, 414 U.S. at 146-47. Here, the jury was never told that either

Mahender or Varsha Sabhnani could be convicted of aiding and abetting based upon a failure to act. Indeed, immediately before the instruction on willfulness, the jury was informed that "[i]n order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate herself in some way with the crime and that she or he willfully and knowingly seek *by some act* to help make the crime succeed." Tr. 5035 (emphasis added). Immediately after the challenged language, the jury was instructed that the "mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting." Tr. 5036. *Cf. United States v. Elfgeeh*, 515 F.3d 100, 134-35 (2d Cir. 2008) (finding it "highly unlikely" that jury relied on erroneous sentence that was immediately preceded and followed by correct statements of the charge). An aider and abettor, the district court said, must "know that the crime is being committed and *act* in a way which is intended to bring about [its] success." (emphasis added).

The repeated emphasis in the instructions on the proposition that an aider and abettor must "seek by some act to make the crime succeed" was further stressed in the judge's summary of the charge. The district court instructed the jury to ask itself three questions to determine whether a defendant aided or abetted the commission of a crime:

> Did the defendant participate in the crime charged as something she or he wished to bring about?
> Did the defendant associate herself or himself with the criminal venture knowingly and willfully?
> Did the defendant seek *by her or his actions* to make the criminal venture succeed?

Tr. 5036 (emphasis added). If the government proved beyond a reasonable doubt that the defendant

did these things, the district court instructed, "then the defendant is an aider and abettor and therefore guilty of the offense." But "if on the other hand your answers to any one of these series of questions . . . is no," Judge Spatt continued, "then the defendant is not an aider and abettor and you must find him or her not guilty as to aiding and abetting." Tr. 5036-37.

We conclude that the charge's repeated emphasis on the necessity of acting in order to aid and abet, coupled with the crystal clear summary, was sufficient to ameliorate any possible confusion that might conceivably have arisen from the willfulness instruction. *See Brown v. Greene*, 577 F.3d 107, 111-12 (2d Cir. 2009) (collecting cases upholding jury charges containing language that might have created some confusion about the burden of proof, because the charges as a whole made clear that the cases were governed by the "beyond a reasonable doubt" standard); *United States v. Locasio*, 6 F.3d 924, 941 (2d Cir. 1993) (ambiguous summary of element did not warrant reversal where earlier discussion of element was clear). This was not a case in which the jury instructions were insufficiently detailed as to an essential element of the crime *and* were never clarified by other language, such that the jury could have convicted based on a legally erroneous theory. *See, e.g.*, *United States v. Hassan*, 578 F.3d 108, 129-34 (2d Cir. 2008) (instructions that failed to explain to jury that defendant needed to have intent to import particular controlled substance and that other substances referenced in the evidence were not controlled substances left open possibility for jury to convict on importation of other substances that were not illegal). Here, the instructions clarified what was required to convict, and the judge's three-question summary of the charge was perfectly clear, removing the possibility of any confusion on the jury's part. *Cf. United States v. Moran*, 493 F.3d 1002, 1009-10 (9th Cir. 2007) (while instructions might have had "minor ambiguity" after a "careful picking apart" of their wording, clear summarizing or overview paragraph that conveys

30

basic point to jury can cure potential error).

Mahender Sabhnani makes two arguments in reply. First, he contends that Judge Spatt erroneously believed that he could be convicted for aiding and abetting based solely on his failures to act. To be sure, when counsel objected to the instruction on willfulness during the charging conference, Judge Spatt did overrule the objection, suggesting that the employer of a domestic servant does have an obligation to act when he allows "for five years . . . beatings, deprivation, lack of food, sleeping on the floor, wearing tattered gowns, [and] hit[s] with a stick" to take place in his home. Tr. 4427. Notably, however, in denying Mahender's Rule 29 motion, the judge noted that "there was sufficient evidence at the trial to prove that Mahender affirmatively acted with the specific intent to advance the crimes alleged in the indictment." Even more importantly, the jury only heard the instructions, not Judge Spatt's opinion at the charging conference, and our concern on appeal is the *effect* of jury instructions, not "the district court's *purpose* in stating the jury instructions as it did." *Hassan*, 578 F.3d at 132. Mahender points next to the government's summation. In his sole reference to the necessary requirements for aiding and abetting, the government attorney stated without objection during the main summation that:

> You don't have to have actually committed the crime to be an aider and abettor. All that needs to be established is that somebody else committed the crime, and that you knowingly and willfully associated yourself with that other person in some way to help with the crime. Help with the crime. And that can be done by actions, or it can be done by a failure to act.
> A failure to act with specific intent, to fail to do something the law requires.

Tr. 4693. Mahender contends that these words created a "not insubstantial" risk that the willfulness instruction led the jurors to convict him on an invalid basis. Mahender's Br. 29. Here, however, we have already determined that the jury instructions, read as a whole, clearly apprised the jury of what

31

it was required to find in order to convict. We agree that a party's summation can heighten the *already present risk* that an erroneous jury instruction may mislead the jury. *See, e.g.*, *United States v. Joseph*, 542 F.3d 13, 18-19 (2d Cir. 2008). But that situation is not this case. The jury instructions, which we presume that jurors follow, *see, e.g.*, *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006), were clear that Mahender could not be convicted solely because he knew of Varsha's crimes or acquiesced in her actions, without acting himself. And to the extent the prosecutor's summation did misstate the applicable law, Mahender raised no objection below and does not press the issue here in those terms.

Given our conclusion that the instructions as a whole adequately conveyed to the jury the law it was to apply, we need not and do not address Mahender's argument that the error he alleges was sufficiently prejudicial to taint each of his convictions, including the four separate conspiracy convictions to which the challenged instructions did not apply. We conclude simply that the aiding and abetting instruction, considered as a whole, adequately conveyed to the jury the necessary and applicable requirements for aiding and abetting, and that Mahender's argument to the contrary is without merit.

### B. Sufficiency of the Evidence

Mahender also challenges the sufficiency of the evidence to support his convictions for forced labor, peonage, document servitude, and conspiracy to commit these crimes. We review de novo challenges to the sufficiency of the evidence. *United States v. Abdulle*, 564 F.3d 119, 125 (2d Cir. 2009). In reviewing a claim that the evidence was insufficient to sustain a defendant's conviction, "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses'

32

credibility." *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (quoting *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999)) (internal quotation marks omitted). "We will sustain the jury's verdict[s] so long as *any* trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted).

Mahender's main contention on appeal is that the trial evidence was insufficient to show he had knowledge that Varsha was threatening or physically abusing the maids — and thus *a fortiori* that the evidence was inadequate to establish his intent to participate in the crimes of forced labor and peonage, whether as a principal, an aider and abettor, or a conspirator. Mahender does not directly challenge the sufficiency of the evidence to support his convictions for document servitude and conspiracy to commit document servitude, but instead argues that because the evidence was insufficient to sustain his forced labor and peonage convictions, he cannot be guilty of these "derivative" offenses. For the following reasons, we disagree with these contentions.

### 1. Forced Labor and Peonage Convictions

With regard to the forced labor charges, 18 U.S.C. § 1589 at the time of the Sabhnanis' convictions prohibited "knowingly provid[ing] or obtain[ing] the labor or services of a person by," *inter alia*, "threats of serious harm to, or physical restraint against, that person," "by means of any scheme, plan or pattern intended to cause the person to believe that, if the person did not perform such labor . . . that person or another person would suffer serious harm or physical restraint," or "by means of the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1589(a)(1)-(3) (2000). The jury convicted Mahender of obtaining the labor or services of Samirah and Enung both "through threats of serious harm or physical restraint against [them]" and "through a scheme, plan

33

or pattern intended to cause [them] to believe that non-performance would result in serious harm." Verdict Sheet 2-4. The peonage statute, 18 U.S.C. § 1581(a), prohibits "hold[ing] or return[ing] any person to a condition of peonage . . . ." To prove peonage, "the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009).

At the start, the jury had a more than ample basis on which to conclude that Mahender knew of both the threatened and actual maltreatment of Samirah and Enung. "[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences" of a defendant's knowledge and his criminal intent. *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008). Here, Samirah and Enung lived and worked in Mahender's home — a home from which he also operated his business — for five and two-and-a-half years, respectively. The jury was entitled to credit the maids' testimony that during this time Mahender witnessed his wife humiliate them — when, for instance, Enung was required to stand in one place until she confessed to stealing chocolate and Samirah was forced to pick up one by one the tiny pieces of paper that Varsha Sabhnani had just thrown to the ground. There was substantial evidence, moreover, that Mahender observed Samirah eat from the trash and wear rags that were inadequate even to cover her body. Indeed, Enung identified one such rag and confirmed that Mahender, along with the rest of the family, observed Samirah wear it every day — even after it had been repeatedly cut up and resewn at Varsha's command, "every time [Samirah] made [a] mistake." Tr. 3196. Samirah testified that Mahender saw her "every day" between 2005 and 2007, Tr. 2367 — a period during which Varsha repeatedly cut Samirah on the face with a knife and, indeed, on one occasion (after a report from her

34

husband) beat Samirah about the face with an umbrella, leaving Samirah's face bleeding and swollen. Tr. 1855-57. Samirah testified that Mahender saw her wearing rags and that he "[saw her] face, . . . the clothings . . . [and] all the marks from the beating from missus. I would cry and the mister would look at me." Tr. 2368. Litras, Mahender's employee, did not live in the Sabhnani household and saw the maids only infrequently. Tellingly, however, even apart from the injuries the maids directly showed her in April 2007, she testified to noticing their "very messy . . . tattered and torn" clothing and, on one occasion, blood dripping from Samirah's hairline. Tr. 3860. The jury clearly had more than ample evidence from which to infer Mahender's awareness of the maids' plight.

There was also sufficient evidence of Mahender's intent to use Varsha's threats and maltreatment against the maids in order to obtain their labor. Samirah testified that on one occasion when she fell asleep cleaning a bathroom of one of the children, "mister told missus that Sami [Samirah] was not washing, but . . . was sleeping in the bathroom" and Varsha Sabhnani "came with something to hit." Tr. 1869. Samirah, afraid, ran away and urinated by the stairs, soiling Mahender's shoes as two of the children cried. Samirah further testified as follows:

Q. Did you sometimes get punished for things that you did that the Missus didn't see you do?
A. Yes.
   Yes. The Mister would report to the Missus that I slept in the bathroom upstairs and the Missus would immediately hit me. And another time . . . it was during the fasting months for the Muslims. I couldn't fast because I didn't eat in – I ate [food] from the garbage, and the Mister saw it, and told the Missus about it, and immediately the Missus got very angry. "You again stole the food?" And I said I found it in the garbage, and I was hit.

Tr. 1848-49. It is of no importance that, as Mahender points out, Samirah testified that he was not present when Varsha hit Samirah for eating the food, nor does it matter whether he was present on

35

the other occasions when she was punished after he reported her misdeeds. The jury was not required, as Mahender contends, to infer that he was acting charitably by reporting the maids' conduct to his wife. On the contrary, the jury was entitled to infer from these incidents and from the other evidence of Mahender's knowledge of abuse that when Mahender reported Samirah's conduct to Varsha, he knew how she would react.

Mahender contends that even if there is sufficient evidence to support his conviction for forced labor, his peonage conviction is infirm because there was no direct evidence that he held Samirah and Enung in involuntary servitude in satisfaction of a real or alleged debt. Samirah, Enung, and Samirah's daughter, Lita, testified that Varsha told them repeatedly that if the maids wanted to be returned to Indonesia they would have to reimburse the costs of bringing them to the United States. Enung specifically testified that she did not run away from the Sabhnanis' residence in part because she "still owe[d]" months of work to Mahender and Varsha. "I was very frightened. I didn't dare to go out of the house prior to the debt being paid off." Tr. 3188. Mahender concedes that this testimony, if credited, might be adequate to support his wife's conviction. He contends, however, that it is insufficient to establish *his* intent to hold the maids in satisfaction of a debt because he "was not present during any conversation about repaying money." Mahender's Br. at 58. We disagree that this is the relevant question, and that the evidence was insufficient in any respect.

18 U.S.C. § 1581(a) prohibits the holding of a person in "a condition of peonage." Peonage is compulsory service in payment of a debt that can be real or artificially created. *See Bailey v. Alabama*, 219 U.S. 219, 242 (1911); *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944). Here, the jury was entitled to infer first that Mahender knowingly participated in the creation of an obligation on the maids' part to work. The jury was entitled to infer that the appellants paid for the

36

maids' travel to the United States based not only on the involvement of Varsha Sabhnani's family, but also upon Varsha's statements that this money had to be repaid if the maids were to leave. Samirah testified, for instance, that when she begged to be given away she was told by Varsha that she was brought to the United States in an airplane and that if she was to be given to someone else, that cost would have to be paid back: "[T]he missus answered, you think I have money tree? You came here with money. If you had 100 million [rupiahs], I'll give you to someone else." Tr. 1881. Enung also testified that her salary was paid "up-front" in its entirety, and that Varsha was supposed to be the one paying it. The jury was permitted reasonably to infer that Mahender knew of these payments, and that they evinced an intent to create a debt-like obligation on the maids to work. *Cf. Pierce*, 146 F.2d at 85-86 (evidence sufficient to support peonage conviction when defendant, among other acts, paid the full fine owed by incarcerated women in exchange for them agreeing to work for him); *Bernal v. United States*, 241 F. 339, 341 (5th Cir. 1917) (defendant convicted of peonage paid for victims' transportation to come to work for her).

Second, the evidence also sufficiently demonstrated that Mahender, who benefitted from the maids' labor, knew that the maids were being forced to work and that the maids were completely dependent on the Sabhnanis for food, clothing, and shelter, the family's provision of which contributed to the maids' obligated status. *Cf. Pierce*, 146 F.2d at 85-86 (defendant contributed to victims' indebtedness by buying them clothes and other gifts). Indeed, the record shows that during the summer months when the Sabhnanis departed, neglecting to leave adequate provisions for the maids, it was Mahender who called Litras to put her in touch with his wife, who instructed Litras to obtain food — usually many loaves of bread — for the maids, and to pay for it with petty cash from

Mahender's office.[14] From the evidence that Mahender reported on Samirah when she foraged in the garbage for something to eat, the jury was entitled to infer both that Mahender knew the maids were in a condition of abject dependence, and that he both intended and acted to keep them in that state. Under these circumstances, the evidence supported the conclusion that Mahender, having knowingly contributed to the creation of the maids' indebted situation and knowing of their dependence on the family, forced the maids to work through the threat of violence from his wife. We therefore conclude that there was sufficient circumstantial evidence from which the jury could infer that Mahender acted to aid and abet the holding of the maids in satisfaction of their "obligations" to the Sabhnanis.

For substantially the same reasons, we also reject Mahender's claim that the evidence was insufficient to support his convictions for conspiracy to commit forced labor and peonage. The existence of a criminal agreement between two persons can be inferred from circumstantial evidence. *Huezo*, 546 F.3d at 180; *see also United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) (Friendly, *J.*) ("Although it is usual and often necessary in conspiracy cases for the agreement to be proved by inference from acts, the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant."); *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996) ("A tacit understanding will suffice to show agreement for purposes of a conspiracy conviction. There need not be any written statement or even a speaking of words which expressly communicates agreement."). As to a defendant's participation, even "a single act may be sufficient for an inference of involvement . . . if the act is of a nature

[14] Litras testified that generally speaking her only contact with the maids during the summer months was on these occasions when she passed food to them through a partially opened door — and that she never saw the maids outside when the Sabhnanis were away.

38

justifying an inference of knowledge of the broader conspiracy." *Huezo*, 546 F.3d at 180 (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)) (internal quotation marks omitted). Here, the evidence is ample that Mahender assisted his wife in bringing the maids to his home, that he did so to benefit from their labor, which he helped to direct, and that, knowing of his wife's threats and punishments, he aided her in meting them out. This evidence provides more than a sufficient basis on which to conclude that there was a "tacit understanding" between Mahender and Varsha that the maids would be held in involuntary servitude and peonage in the Sabhnanis' home.

### 2. Other Convictions

As already noted, Mahender does not directly challenge the sufficiency of the evidence to support his convictions for document servitude and conspiracy to commit document servitude. Instead, he argues that, because the evidence was insufficient to support his forced labor and peonage convictions, he necessarily cannot be guilty of the "derivative" offense of document servitude. Mahender's Br. 64. Mahender's argument is based on a fundamental misreading of the document servitude statute. Section 1592 of Title 18 provides that "[w]hoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person" *either* "in the course of" a violation of one of a number of statutes, including the forced labor and peonage statutes, *or* "with the intent to violate" the same statutes, is guilty of a crime. 18 U.S.C. §§ 1592(a)(1)-(2). Mahender continually refers to this crime as an offense that is merely "derivative" of the forced labor and peonage crimes. This is incorrect: a defendant may be convicted under § 1592 for knowingly concealing immigration documents merely "with intent to violate" the forced labor or peonage statutes. 18 U.S.C. § 1592(a)(2).

39

In any event, we have already determined that Mahender's convictions for forced labor and peonage were supported by sufficient evidence. Here, the evidence that Samirah's and Enung's passports and other immigration documents were kept in a locked cupboard in the closet adjacent to the Sabhnanis' master bedroom was ample. The jury could infer Mahender's knowing possession of Samirah's and Enung's passports and other immigration documents from the fact that his own passport was kept in the same cupboard, and from the closet's position in the house. Therefore, Mahender's convictions for document servitude and conspiracy to commit document servitude are supported by sufficient evidence.

Finally, without challenging the sufficiency of the evidence to support his conviction, Mahender suggests that his conviction for harboring illegal aliens should be vacated because the harboring statute, 8 U.S.C. § 1324(a)(1)(A), was not "designed" to cover a situation in which a defendant forces an alien who wishes to leave the country to remain here. Such conduct is "outside the scope" of the statute, which was only intended to criminalize conduct facilitating an alien's illegal presence in the United States. Mahender's Br. 64-65. Suffice it to say that the text of the statute cannot support such limitations. The statute renders guilty of a crime any person who, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). The statute does not attempt to distinguish among various reasons why an alien has "come to, entered, or remains" in the country illegally, nor does it distinguish among various motives a defendant might have for "concealing, harboring, or shielding" the alien. "[Section] 1324, on its face, does not restrict the persons within its reach." *United States*

*v. Kim*, 193 F.3d 567, 573 (2d Cir. 1999).  We decline Mahender's invitation to read words into the statute that are not there.

### III.  The Refusal of Prosecution Witnesses To Speak to Defense Counsel

On cross-examination by Mahender's counsel, several of the prosecution witnesses, including Deborah Litras, admitted that they had refused to speak to defense counsel prior to the trial.  In the jury instructions, the district court told the jury that defense counsel had acted properly in attempting to interview witnesses, but that the witnesses were also within their rights to refuse to speak:

> Also, you have heard testimony from witnesses that attorney Stephen Scaring [Mahender's trial counsel] asked to speak to them prior to their testimony.  I instruct you that Mr. Scaring had a right to attempt to interview these witnesses before they took the stand.  However, I also instruct you that these witnesses had a right to decline to speak to him.  And no unfavorable inference should be drawn against them because of that declination.

Tr. 5005.  Judge Spatt overruled the defense's objection to this instruction at the charging conference.

Appellants argue that the district judge's instruction that the jury could draw no unfavorable inference against prosecution witnesses from the fact that they refused to be interviewed by the defense was erroneous because it prevented the jury from evaluating a fact that went to the issue of witness credibility.  Absent the instruction, the Sabhnanis contend, the jury could have reasoned that because these witnesses refused to speak to defense counsel, they must have been biased against the Sabhnanis.  Moreover, the Sabhnanis argue, the instruction may have cast Mahender's trial counsel in a negative light for even asking witnesses the question whether they had refused to speak to the defense prior to trial.

41

We review a claim of error in the content of jury instructions de novo. *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). We have no difficulty concluding that there was no error in the instruction here. Mahender himself concedes that the instruction was correct insofar as it recognized that witnesses have a right to decline to be interviewed. *See, e.g.*, *United States v. Agostino*, 132 F.3d 1183, 1191 (7th Cir. 1997); *United States v. Miller*, 381 F.2d 529, 538 n.7 (2d Cir. 1967) ("While the Government is doubtless bound not to obstruct a defendant's access to a prospective witness, we know of no rule requiring the witness to submit to an interview."); *United States v. James*, No. 02 CV 0778(SJ), 2007 WL 914242, at \*15 n.10 (E.D.N.Y. Mar. 21, 2007). The instruction did nothing more than inform the jury of this right and instruct that a witness does not act wrongfully by exercising it. The defense was still free to suggest — and did, through cross-examination and in summation — that the refusal to meet with defense counsel could suggest a witness's greater sympathy for or affiliation with the other side of the case.

Moreover, the jury was explicitly charged that it should evaluate the credibility of witnesses based on "the circumstances under which each witness testified" and "every matter in evidence that tends to show whether a witness is worthy of belief." Tr. 5011. Among these matters, the judge specifically instructed the jury that:

> How you choose to believe a witness may be influenced by *any* bias, resentment or anger that you may perceive the witness to have. Does the witness have a relationship with the government or a defendant that may affect how he or she testified? Does the witness have some incentive, loyalty or motive that might cause him or her to shade the truth? Or does the witness have some bias, prejudice or hostility that may have caused the witness consciously or not to give you something other than a complete, accurate account of the facts?

Tr. 5012 (emphasis added). This charge clearly allowed the jury to take into account any bias a witness might have, including any bias resulting from a relationship with the government. Finally,

42

we reject as meritless any claim that the instructions could fairly be read to cast aspersions on Mahender's trial counsel, given the court's explicit statement that counsel had every right to attempt to interview the prosecution's witnesses.

**IV. The Defense's Motion to Re-Open Following the Commencement of Jury Deliberations**

The Sabhnanis next contend that the district court abused its discretion in failing to grant their motion to reopen the proceedings after the jury had begun its deliberations in order to present newly discovered evidence of the alleged bias of a prosecution witness. After closing arguments, during which some of her testimony had been attacked by the defense, prosecution witness Deborah Litras sent an e-mail to a family friend that read in relevant part as follows:

> I really do hope that the "theatrics" of the closing arguments by the defense will not sway the jury away from the right decision. The thing that scares me is that there never seems to be any justice in the world. I guess we'll just have to wait and see. I don't think it's going to be much longer. See 'ya. Deb.

Tr. 5150. The defense, upon discovering the e-mail, moved to reopen the case and to recall Litras for the purpose of questioning her about it. Defense counsel argued that the e-mail showed that Litras was biased in favor of conviction. The prosecution argued that the e-mail, fairly read, did not indicate a bias, but a desire for justice to be done, and also that it was irrelevant to any issue the jury was considering in that it principally expressed Litras's opinion of the closing arguments.

The district court denied the defense motion to reopen. The judge noted that the e-mail did not expressly state that Litras was biased in favor of conviction and that, in any event, her trial testimony was explicit that she "believed the maids' complaints." Tr. 5188. "It was obvious from [Litras's] testimony . . . that she favored the maids [and] felt sorry for the maids, and she was behind the maids in this case." *Id.* Because her testimony indicated that Litras "favor[ed] the maids over

43

her own boss," Tr. 5189, and because the jury also heard evidence that she had refused to speak to defense counsel while meeting with the government several times, Litras's leanings were already clear. The court also noted that reopening the case solely for testimony regarding the e-mail would create enormous practical difficulties and would be needlessly disruptive of the jury's deliberations. Finally, the court agreed with the prosecution that the e-mail was irrelevant to the question whether Litras was biased when she testified, and only reflected her "dismay . . . [at] the theatrics of the closing argument[s], which somewhat denigrated her." Tr. 5196.

We review a district court's determination whether to reopen a case after the jury has begun its deliberations for abuse of discretion. *See United States v. Crawford*, 533 F.3d 133, 138 (2d Cir. 2008); *United States v. Golomb*, 754 F.2d 86, 89 (2d Cir. 1985). In *Crawford*, we noted the factors that a district judge should consider in exercising this discretion:

> The court must consider the timeliness of the motion [to reopen], the character of the testimony, and the effect of granting the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered.

*Crawford*, 533 F.3d at 138 (quoting *United States v. Nunez*, 432 F.3d 573, 579 (4th Cir. 2005)) (emphasis omitted). Considering the *Crawford* factors, timeliness cannot be counted against the appellants here, as their counsel obtained Litras's e-mail only just before making the motion to reopen. Each of the other relevant factors, however, weighs against the Sahbnanis' position. We conclude based on these factors that the district court did not abuse its discretion.

44

At the start, the parties disagree about whether, in assessing the character of the evidence, we should construe it in the light most favorable to the defense. We need not resolve this question, however, because even viewing the e-mail and its potential effect in the Sabhnanis' favor, we conclude that the e-mail's significance did not merit reopening. We agree with the district court that to the extent the e-mail tended to show that Litras favored the maids, it was already obvious from her testimony that she believed the maids' stories of abuse and sympathized with them. Litras testified that she "felt sorry" for the maids, Tr. 3937, that she provided the maids with food surreptitiously and hid the evidence from the Sabhnanis, that she was "upset" after Samirah displayed her injuries, Tr. 3874, 3901, and that she was "glad" when she learned that Samirah had fled the Sabhnanis' home. Tr. 3969. Mahender contends that the e-mail would have corrected a misimpression created by the government that Litras, who suffered from cancer, was reluctant to testify because doing so would place her job and her health insurance in jeopardy. Despite her personal concerns, however, Litras made it abundantly clear to the jury that her sympathies were with the maids and that, for this reason, she was not a reluctant witness. The e-mail would thus have added very little to what the jury had already heard.

The district court also properly considered the practical difficulties that would be caused by stopping the jury's deliberations and recalling Litras to testify. The potential for such a course of events to give "distorted importance" to evidence that is of marginal significance is obvious: here, there was a real risk that the jury would be distracted in its deliberations from the main issues. *See Crawford*, 533 F.3d at 140-41 (collecting cases noting a presumption that the significance of evidence introduced after the jury has begun deliberating will be misconstrued). We conclude that the district court's reasons for denying the motion — that the e-mail was of little or no evidentiary

45

value in the determination of the Sabhnanis' guilt, that it would not meaningfully add to what the jury already knew or could infer about Litras's leanings, and that the disruption that would ensue would outweigh any potential usefulness of the evidence to the jury — were sound. The district court did not err in denying the motion to reopen, much less abuse its discretion.

## V.  The Allegation of Juror Misconduct

About three weeks before the jury verdict, which was returned on December 17, 2007, a photographer for the *New York Daily News*, Stephen Barcelo, was sitting in his car in the parking lot of the federal courthouse in Central Islip, New York, where the trial was taking place, at about 5:00 p.m. His car was in the first row of parked cars, where Barcelo often parked in order to photograph the defendants and the lawyers in the case as they arrived and departed. On this occasion, Barcelo's car window was partially open. He observed a group of people leave the courthouse. Based on the time of day and the fact that he recognized some of them, he believed the group to be the Sabhnani jurors. Two women from the group – women he did not recognize – passed by his car door, speaking inaudibly. A minute or two later, he heard from behind his car a woman's voice loudly saying the words "guilty, guilty" in a laughing manner. Barcelo was then facing forward in his car in a dark parking lot, and he did not see who made the statement. Barcelo related this incident to fellow photographer Mary McLaughlin of the *New York Post* and to a reporter from the *Daily News*, Richard Weir. Kieran Crowley, a reporter for the *New York Post*, overheard Barcelo's statements to McLaughlin and related them to Mahender's defense counsel on or about December 19 — two days after the jury verdict.

The Sabhnanis, contending that the incident demonstrated that the Sabhnani jurors had engaged in impermissible deliberations before the close of evidence, moved for a new trial pursuant

46

to Fed. R. Crim. P. 33 and also for a hearing at which jurors would be required to testify. The district court held a hearing at which Barcelo appeared. Barcelo testified that because the parking lot was dark that night, he could not and did not recognize the two women as members of the Sabhnani jury, but merely assumed that they were. Moreover, Barcelo admitted that as of the day of his testimony, he probably couldn't identify any member of the jury because he did not regularly visit the courtroom during the trial, but mostly observed groups of people coming in and leaving the courthouse. Barcelo acknowledged that there were other people in the parking lot that evening, including spectators and jurors from other trials, and that, because he did not witness the conversation, he could not say for certain who made the statement "guilty, guilty" or even whether it was one of the two women he had initially seen. Barcelo stated he could not hear any of the woman's other words – and so apparently could not say whether she was discussing a case, a movie, or her own failure to go to the gym. He could not identify her voice, or provide any additional context for her statement.

Judge Spatt denied the defense motion for a new trial and also the motion for a hearing that would include juror testimony. *See United States v. Sabhnani*, 529 F. Supp. 2d 384 (E.D.N.Y. 2008) (district court opinion denying motion for new trial and evidentiary hearing on juror misconduct). The judge accurately noted that Barcelo's evidence fell far short of establishing that any misconduct had occurred. The judge expressed doubt at Barcelo's ability to identify and recognize members of the Sabhnani jury in light of his testimony that he did not visit the courtroom for any significant period of time. *Sabhnani*, 529 F. Supp. 2d at 389. The court noted that Barcelo could not testify to the context in which the "guilty, guilty" statement was made, could not identify the person who made the statement, and had admitted during his testimony that he only assumed the speaker was a member of the Sabhnani jury. *Id.* at 389-90. Noting that the facts asserted were "vague and uncertain," the

47

judge concluded that "the testimony and affidavits [were] insufficient to justify a further hearing with testimony from the jurors, and certainly not a new trial." *Id.* at 390. The judge further concluded that, even if the speaker had been shown to be a member of the Sabhnani jury and to have been referring to the case, "[o]ne juror's potentially out-of-context, single word comment, does not demonstrate that the jurors prematurely deliberated [and] does not demonstrate that the juror would be unreceptive to opposing arguments or that any juror failed to participate in deliberations in good faith." *Id.* at 393. The judge noted based on his own observations that the Sabhnani jury had "carefully and intently followed all of the testimony and the presentation of the evidence with close attention." *Id.* at 391.

"We review a trial judge's handling of alleged jury misconduct for abuse of discretion." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004). A trial judge has "broad flexibility" in responding to allegations of such misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences. *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994). We have stated, moreover, that district judges should be particularly cautious in conducting investigations into possible jury misconduct after a verdict, and that such investigations are only warranted when there is "clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006) (quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)) (internal quotation marks omitted).

The tenuousness of the Sabhnanis' argument is self-evident from Barcelo's testimony, and we find no abuse of discretion in the district court's decision not to pursue this matter further. This case presents no "clear, strong, substantial and incontrovertible evidence" of juror misconduct, and

48

accordingly the district court properly determined that no further investigation was merited and that the motion for a new trial should be denied. *See Vitale,* 495 F.3d at 197.[15]

## VI.  Sentencing Issues

The defendants challenge various aspects of their sentences, as well as the calculation of the amount of restitution to the victims and the scope of the property forfeiture.  With regard to the Sentencing Guidelines issues, we review a challenged sentence for its procedural and substantive reasonableness under an abuse of discretion standard.  *United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008) (en banc).  We review legal questions de novo, and we review the district court's factual determinations under a clear error standard.  *United States v. Friedberg,* 558 F.3d 131, 133 (2d Cir. 2009).  In assessing procedural reasonableness, we review, *inter alia*, whether the district court correctly calculated the applicable Guidelines range and whether it relied on any clearly erroneous factual findings.  *Cavera*, 550 F.3d at 190; *see also Friedberg*, 558 F.3d at 133.

## A.  Double Counting

Varsha Sabhnani was sentenced to 132 months' imprisonment, which represented a sentence below her Guidelines range of 151 to 188 months.  Varsha Sabhnani's Guidelines range was based upon her criminal history category of I, and two separate offense level calculations as to the two victims.  For the offense level computation relevant to Samirah, the Guidelines imposed a base offense level of 22 pursuant to U.S.S.G. § 2H4.1.  This base offense level was adjusted upwards two points for serious bodily injury, pursuant to § 2H4.1(b)(1)(B) and was also adjusted upwards four points for use of a dangerous weapon pursuant to § 2H4.1(b)(2)(A).  Additional enhancements were

---

[15] Given this conclusion, we need not address the district court's additional determination that, in any event, Federal Rule of Evidence 606(b) would prohibit jurors from testifying at the hearing the Sabhnanis sought.

imposed: three points for holding the victim for more than one year (§ 2H4.1(b)(3)(A)), and two points for knowingly committing an offense involving a vulnerable victim (§ 3A1.1(b)(1)), yielding an adjusted offense level of 33. The calculation as to Enung amounted to 27, which in turn added one point to the total for the offenses against Samirah to yield a final adjusted level of 34.

Varsha Sabhnani challenges her sentence on the ground that the district court should not have imposed enhancements both for causing serious bodily injury and for using a dangerous weapon. The district judge imposed a four-point adjustment for use of a dangerous weapon based on the evidence that a number of such weapons were used in the commission of Varsha's crimes, including a knife, a rolling pin, and boiling water. Sentencing Tr. 10. Separately, the court determined that imposition of the "serious bodily injury" enhancement was proper because the jury had been charged and had found that Samirah and Enung had suffered serious bodily injury with respect to the harboring of aliens counts. According to Varsha Sabhnani, this amounted to impermissible double counting. For the following reasons, we disagree.

"Impermissible double counting occurs [under the Sentencing Guidelines] when one part of the guidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the guidelines." *United States v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000) (quoting *United States v. Napoli*, 179 F.3d 1, 12 n.9 (2d Cir. 1999)) (internal quotation marks omitted). Multiple adjustments are properly imposed, however, "when they aim at different harms emanating from the same conduct." *Id*. As this Court noted in *United States v. Rappaport*, 999 F.2d 57 (2d Cir. 1993), enhancements are not duplicative when they reflect "different facets of the defendant's conduct," *Rappaport*, 999 F.2d at 60, or, as we put it in *Volpe*, when "[t]he . . .

50

adjustments at issue . . . do not serve identical purposes, but rather address separate sentencing considerations," *Volpe*, 224 F.3d at 76.

Such is the case here. The conduct that would subject a defendant to the adjustment for use of a dangerous weapon does not necessarily subject that defendant to the enhancement for causing serious bodily injury, nor are the kinds of harms at which these adjustments are aimed identical. Here, the district judge based Varsha's "use of a dangerous weapon" adjustment on the evidence that she had employed implements such as a knife and boiling water against Samirah. Because the use of such weapons did not require Varsha Sabhnani also to inflict serious bodily injury on her victims, the substantial evidence that she did inflict such injury mandated a separate adjustment — involving no double counting — to take account of this separate harm. *Cf. United States v. Donelson*, 450 F.3d 768, 774 (8th Cir. 2006) (noting that harms caused by committing an offense while endangering multiple victims and by using a firearm in connection with another felony offense are separate, and therefore imposition of adjustments based on each was not impermissible double counting).

*United States v. Hudson*, 972 F.2d 504 (2d Cir. 1992), on which Varsha principally relies, is not to the contrary. In *Hudson*, the defendant drove his car directly towards two U.S. Marshals in an attempt to escape from them. *Id.* at 505. The district court found that the defendant's use of a car was the use of a dangerous weapon, and thus applied the base offense level for "aggravated assault" under the Guidelines rather than the base offense level for obstructing or impeding officers. *Id.* The court then, in addition, imposed a four-point adjustment pursuant to a Guidelines provision that allowed for adjustments in aggravated assault cases in which "a dangerous weapon . . . was otherwise used." *Id.* at 505-06; *see also* U.S.S.G. § 2A2.2(b)(2)(B). We vacated *Hudson*'s sentence because the use of the car was the only facet of the defendant's conduct that caused the district court to use the

"aggravated assault" base offense level, and that same conduct was also the basis for its "dangerous weapon" adjustment. *Hudson*, 972 F.2d at 507. As we later observed in *Rappaport*, "[b]oth of these increases necessarily reflected the same facet of Hudson's conduct." 999 F.2d at 61. By contrast here, the fact that Varsha Sabhnani used dangerous weapons in connection with her crimes was distinct from the fact that she also inflicted serious injury on her victims — neither aspect of her conduct necessarily implied the other. We conclude, therefore, that both were properly taken into account in setting her offense level.[16]

### B. Vulnerable Victims Enhancement

Both defendants challenge the district court's enhancement of their sentences by two levels pursuant to the "vulnerable victim" enhancement of the Sentencing Guidelines, U.S.S.G. § 3A1.1(b)(1), which provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. § 3A1.1(b)(1). The application notes to the section prevent its application when the factors that made the victim unusually vulnerable are already incorporated into the guideline for the relevant offense. The Sabhnanis argue that Congress, in enacting the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), Pub. L. No. 106-386, 114 Stat. 1464 (Oct. 28, 2000), considered the same factors that the judge relied on to conclude that Samirah and Enung were vulnerable victims in this case, and that U.S.S.G. § 2H4.1, the offense guideline for forced labor and for peonage, incorporates these factors. The district court therefore erred, they argue, in imposing the vulnerable victim enhancement. We disagree.

---

[16] For substantially the same reasons we conclude there was no double counting, we also reject Varsha Sabhnani's claim that she was entitled to a "cumulative effects" departure. Varsha's Br. 57.

The district court made the following particularized findings with regard to whether Samirah and Enung were vulnerable victims:

> [T]hey were both native Indonesians; neither one spoke a word of English; had never been in the United States before; were totally dependent upon the defendants for their basic human needs of food, clothing and shelter; they never received any direct payment for services . . . and were therefore unable to support themselves.
> They actually couldn't even leave the house. They couldn't speak. They had no money. Additionally, they were threatened if they left, their family members would be harmed. They would be jailed. The defendants took their passports, visas and other documents, and kept them from the two women. They were in a situation where they had to accept these abusive conditions, of course because they had no alternative.

Sentencing Tr. 31-32. We review these factual findings only for clear error, *United States v. Patasnik*, 89 F.3d 63, 72 (2d Cir. 1996), which we do not find. It is also clear to us that these characteristics, particularly that the maids had never been to the United States, spoke no English, were entirely dependent on the Sabhnanis for basic necessities, and lacked any money and were not directly paid, made them "less likely to thwart the crime[s]" than the average person, *United States v. Kaye*, 23 F.3d 50, 54 (2d Cir. 1994) and "in need of greater societal protection," *United States v. Dupre*, 462 F.3d 131, 146 (2006) (quoting *United States v. Stover*, 93 F.3d 1379, 1387 (8th Cir. 1996)). We have emphasized both of these factors in considering the vulnerable victim adjustment in the past.

The application notes to § 3A1.1(b)(1) state that the term "vulnerable victim" means "a person (A) who is a victim of the offense of conviction . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1) cmt. app. n.2. The notes instruct that the enhancement should not be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." *Id.* The notes cite as an example a hypothetical situation in which a particular offense guideline provides

an explicit enhancement for a specified factor — in such a situation, if that same factor would also serve to make the victim "unusually vulnerable," the vulnerable victim enhancement should not be applied unless there are other, additional factors that render the enhancement appropriate.[17] Plainly, then, when an offense guideline provides for an adjustment for a certain factor that also makes a victim "unusually vulnerable" — that is, that makes a victim less likely to be able "to protect himself from the crime," *Dupre*, 462 F.3d at 144 (internal quotation marks omitted), and in greater need of societal protection — a sentencing court should not apply the § 3A1.1(b)(1) enhancement due to that same factor. However, if the victims are characterized by additional factors not taken into account by an explicit reference in the applicable sentencing guideline, application of the § 3A1.1(b)(1) vulnerable victims enhancement is appropriate.

Here, the Sabhnanis do not (and could not) contend that the offense guideline that provided their base offense level, U.S.S.G. § 2H4.1, expressly incorporates any of the factors the district court relied on to conclude that Samirah and Enung were vulnerable victims. Instead, they claim that the guideline incorporates these factors *implicitly* because Congress, in enacting the versions of the criminal statutes under which the Sabhnanis were prosecuted, took into account the victim characteristics upon which the district court relied in applying the vulnerable victims enhancement. In this sense, the Sabhnanis contend that Samirah and Enung are not "unusually vulnerable," but rather the "prototypical victims Congress aimed to protect." Varsha's Br. at 64.

---

[17] The Application Note provides, in full:
Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.
U.S.S.G. § 3A1.1(b)(1) cmt. app. n.2

54

It is true that the VTVPA includes findings that persons with some of the same characteristics as Samirah and Enung are more likely to be victims of the crimes of forced labor, peonage, and document servitude. "Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable." VTVPA § 102(b)(5), 114 Stat. 1466 (codified at 22 U.S.C. § 7101(b)(5)). Victims, because they will "frequently [be] unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked" and because they are "often subjected to coercion and intimidation including physical detention and debt bondage" and "often fear retribution and forcible removal to countries in which they will face retribution or other hardship," often find it "difficult or impossible" to report crimes committed against them. *Id.* § 102(b)(20), 114 Stat. 1468. In the VTVPA, Congress increased the statutory maximum sentence for several existing crimes including peonage, and enacted new separate offenses, including the forced labor and document servitude statutes at issue here. *Id.* §§ 112(a)(1)-(2), 114 Stat. 1486-89. Finally, Congress directed the Sentencing Commission to amend the Guidelines to "take all appropriate measures to ensure that [the Guidelines] and policy statements applicable to [trafficking offenses] are sufficiently stringent to deter and adequately reflect the heinous nature of such offenses." *Id.* § 112(b)(2)(A), 114 Stat. 1489-90 (codified at 22 U.S.C. § 7109(b)(2(A)).

While it is true that Congress made findings in the VTVPA that the victims of "trafficking" offenses would frequently possess particular characteristics making them vulnerable, and that this factor contributes to the "heinous nature" of such offenses, however, neither the texts of U.S.S.G. §§ 2H4.1 and 3A1.1(b) nor the relevant application notes — which are, after all, what we are

55

construing — support the result the Sabhnanis urge. Indeed, as the Seventh Circuit has observed, the offense guideline pertinent to both forced labor and peonage, which the Sabhnanis identify as the "highest guideline driving [their] sentences," does not say anything about the vulnerability of the victim — and thus specifies no victim-related factor that, according to the application notes to § 3A1.1(b)(1), should therefore be excluded as the basis for a separate, vulnerable victim enhancement. *United States v. Calimlim*, 538 F.3d 706, 717 (7th Cir. 2008). Like the appellants in *Calimlim*, the Sabhnanis assert, in essence, that all victims of crimes like peonage and forced labor are vulnerable, and therefore that none are particularly so. We agree with the Seventh Circuit, however, that this is not the case: "[W]ith enough muscle, it would be possible to coerce a perfectly able-bodied, English-speaking, independent American citizen into forced labor." *Id*. Moreover, the Sabhnanis seek to engage courts applying the vulnerable victims enhancement in a morass of guesswork regarding the extent to which particular characteristics of the victim have been considered by Congress and tacitly incorporated into criminal statutes and associated guidelines that facially make no mention of them. We decline this invitation and conclude that the vulnerable victim enhancement was properly applied in this case.

### C. Calculation of the Amount of Restitution

In 18 U.S.C. § 1593, Congress provided for mandatory restitution to victims in cases of, among other things, peonage, forced labor, and document servitude. 18 U.S.C. § 1593(a). Specifically, the "order of restitution . . . shall direct the defendant to pay the victim . . . the full amount of the victim's losses." *Id.* § 1593(b)(1). The statute defines the "full amount of the victim's losses," in pertinent part, as "the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)" 18 U.S.C. §

56

1593(b)(3). Here, the district court consulted the Fair Labor Standards Act's (FLSA) minimum wage and overtime provisions, 29 U.S.C. §§ 206 and 207, and determined minimum wage rates for the period of Samirah's and Enung's labor, which it multiplied by a statutorily determined factor to calculate overtime pay. The court performed its calculations on the basis that the maids worked 24 hours per day when the Sabhnanis were at home, and eight hours per day when the Sabhnanis left the country during the summer months. The court subtracted the money that had actually been paid to the victims' families in Indonesia. Finally, it doubled the total award pursuant to 29 U.S.C. § 216, which allows for double damages for employers who violate the FLSA's minimum wage and overtime provisions. Based on these calculations, the district court awarded $620,743.82 to Samirah and $315,802.40 to Enung.

The Sabhnanis raise three separate challenges to these awards on appeal. First, they argue that the district court erred in finding that Samirah and Enung were entitled to overtime pay because the court failed properly to apply a statutory exemption to FLSA for payment of overtime to domestic servants who reside in their employer's household. Second, they argue that the district court should have conducted an evidentiary hearing to determine the exact number of hours the victims worked, and that the court clearly erred in calculating the award based on a determination that the victims worked 24-hour days. Finally, they argue that the district court erred in awarding liquidated damages pursuant to 29 U.S.C. § 216(b). We agree that the district court erred in awarding overtime pay, and thus we vacate the restitution award and remand for recalculation. We conclude, however, that the district court was within its discretion not to hold an evidentiary hearing and that it did not err in awarding liquidated damages.

### 1. The Applicability of the FLSA Overtime Provisions

57

Pursuant to 29 U.S.C. § 207, and with regard to covered employees, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half time the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Congress extended this maximum hours provision to domestic workers in 1974. *Coke v. Long Island Care at Home, Ltd.*, 376 F.3d 118, 123 (2d Cir. 2004), *vacated on other grounds*, 546 U.S. 1147 (Mem.) (2006). However, 29 U.S.C. § 213(b)(21) provides that Section 207 "shall not apply with respect to . . . any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. § 213(b)(21). The Sabhnanis argue that this exemption to Section 207 applies to Samirah and Enung and thus that the district court's restitution award, which was calculated using the overtime provision, was erroneous. The government argues that the exemption does not apply on the theory that Samirah and Enung did not reside with the Sabhnanis because the Sabhnanis "failed to provide, among other things, appropriate living quarters, adequate sleeping facilities and adequate meals." Gov't's Br. 127. It is undisputed that Samirah and Enung were "employed in domestic service in a household" under 29 U.S.C. § 213(b)(21); the only question is whether they were employees who "resided" in the Sabhnanis' home.

"Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there." *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir. 2004) (quoting *Collazos v. United States*, 368 F.3d 190, 196 (2d Cir. 2004)) (internal quotation marks omitted). We interpret the unambiguous terms of statutes according to their ordinary and plain meaning. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544

(2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms." (citation omitted)).

To "reside" generally means "[t]o dwell permanently or for a considerable time; to have one's settled or usual abode; to live, in or at a particular place." *Oxford English Dictionary* (2d Ed. 1989). In *Venturella*, we noted that the term "resides" in its normal use "denotes residence." *Venturella*, 391 F.3d at 125 (citing *Webster's Third New Int'l Dictionary* 1931 (2000); *United States v. Namey*, 364 F.3d 843, 845 (6th Cir. 2004)). Other courts have also determined that whether one "resides" in a place, in the natural and ordinary sense of the phrase, refers to whether one lives there and makes one's permanent or semi-permanent home in that place. *See, e.g.*, *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1016 (8th Cir. 2006); *Gusewelle v. City of Wood River*, 374 F.3d 569, 577 (7th Cir. 2004) (city rules requiring employees to "reside" within city limits meant employees must maintain their "primary residence" there); *see also Rosenruist-Gestao E Servicos LDA v. Virgin Enters. Ltd.*, 511 F.3d 437, 450 (4th Cir. 2007) (Wilkinson, J., dissenting) (noting that dictionary meaning of a witness "residing" in a judicial district for purposes of 35 U.S.C. § 24 is that the witness "dwell[s] permanently or for a considerable time" there). This meaning is even used when such "residence" is involuntary, as in the case of one residing in a prison. *See, e.g.*, *Hewitt v. Helms*, 459 U.S. 460, 466 (1983) (describing claim of protected liberty interest in "continuing to reside in the general prison population"), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472, 483 & n.5 (1995).

Because there is no doubt that Samirah and Enung lived in the Sabhnanis' house and did so as permanent residents for a considerable time, we conclude that the maids were "employee[s] who [were] employed in domestic service in a household and who reside[d] in such household" for the purpose of the § 213(b)(21) exemption. *See, e.g.*, *Manliguez v. Joseph*, 226 F. Supp. 2d 377, 381, 388

59

(E.D.N.Y. 2002) (finding that live-in domestic servant was covered by § 213(b)(21) exemption); *see also Almeida v. Aguinago*, 456 F. Supp. 2d 505, 506, 508 (S.D.N.Y. 2006) (plaintiff live-in domestic servant conceded, and court agreed, that § 213(b)(21) exemption applied). The sources relied on by the government to argue against this construction of Section 207 are both unpersuasive and inapplicable.

The government points to an Opinion Letter of the Department of Labor that interpreted, in the context of a different regulation, what it means for an employee to "reside[] on his employer's premises . . . for extended periods of time." Opinion Letter Fair Labor Standards Act (FLSA), 1981 WL 179033 (Dep't of Labor, Feb. 3, 1981) (hereinafter "FLSA Opinion Letter") (quoting 29 C.F.R. § 785.23). The letter determined that the employees in question, who were employed as "houseparents" in a privately-owned community for the developmentally disabled and who stayed overnight at the facilities for five or six days in a row, were "residing" at their employer's premises notwithstanding the fact that the employees maintained their own private residences. *Id.* "Where the facilities offered by the employer provide a home-like environment with private quarters separate from the residents of the group home," according to the FLSA Opinion Letter, the employees should be regarded as residing there (meaning that they need not be paid for hours spent on their own in the private quarters) on the theory that "[i]n light of the amount of time they spend at the group home, it is in effect a second residence." *Id.*

The government claims that under this interpretation, the maids were not "residing" in the Sabhnanis' house because they were not provided with "a home-like environment with private quarters." Nothing about the FLSA Opinion Letter, however, suggests that it was an interpretation of what it means to "reside in [a] household" for purposes of § 213(b)(21). Indeed, it is clear in

60

context that the letter is attempting to answer an entirely different question from the one posed by this case: whether an employee with his or her *own* private residence can *also* "reside" at the employer's premises. The letter's answer to this question tells us very little about whether, on the facts of this case, Samirah and Enung, who had nowhere else to go, were employees who "resided" in the Sabhnani household. Nor does it purport to suggest, at least with regard to domestic service, that it is *only* when an employee has private quarters separate and apart from the area where he or she works that this employee should be regarded as residing at the employer's premises — a circumstance that, in any event, provides a somewhat arbitrary basis for distinguishing among domestic workers who live in their employers' homes and who argue that they are entitled to overtime pay. The FLSA Opinion Letter thus gives us no cause to doubt our interpretation of § 213(b)(21). For the same reasons, we find the cases relied on by the government that apply the Opinion Letter (again to facts not similar to those in this case) inapposite. *See, e.g.*, *Chao v. Jasmine Hall Care Homes Inc.*, No. 2:05-cv-1306, 2007 WL 4591438, *2-3 (E.D. Cal. Dec. 28, 2007).

We therefore vacate the restitution award and remand for recalculation. We note, however, that although § 213(b)(21) prevents the calculation of restitution from being based on an entitlement to overtime, "this exemption does not excuse the employer from paying the live-in worker at the applicable minimum wage rate for all hours worked." 29 C.F.R. § 552.102(a). We find for the reasons set forth below that the district court did not abuse its discretion in awarding 24 hours per day's worth of pay for the days on which the Sabhnanis were present in the house, and that the awarding of double damages was proper. Accordingly, the new award need not deviate from those aspects of the original.

2. The District Court's Decision Not To Hold an Evidentiary Hearing

61

Contending that factual issues regarding the appropriate amount of restitution were in dispute, the Sabhnanis sought to examine Samirah and Enung at an evidentiary hearing before the district court to determine, among other things, the number of hours that they worked. The district court denied this request, noting that in their extensive trial testimony, Samirah and Enung had "covered substantially all the subjects raised by the Defendants" in their objections to the proposed restitution. *United States v. Sabhnani*, 566 F. Supp. 2d 139, 146 (E.D.N.Y. 2008) (District Court restitution opinion). On appeal, the Sabhnanis argue that the district court's failure to hold an evidentiary hearing permitted the government to obtain a restitution award without proving the correct amount of loss and deprived the defendants of their ability to challenge the government's calculations. We disagree.

We have noted, in the context of contested issues regarding the propriety of a restitution award, that the sentencing procedures employed to resolve such disputes are within the district court's discretion so long as the defendant is given an adequate opportunity to present his position: "[T]he district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. . . . All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations." *United States v. Maurer*, 226 F.3d 150, 151-52 (2d Cir. 2000) (per curiam) (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)) (internal quotation marks omitted). In *Maurer*, we concluded that the district court did not abuse its discretion in failing to hold an evidentiary hearing, observing that "the trial record shed substantial light" on the issues in dispute, and that the district court provided the defendant with multiple opportunities to make arguments regarding the award. *Id.* at 152.

Here, the trial testimony made very clear that so long as the Sabhnanis were present, none of the maids' time was truly their own. Both Samirah and Enung offered unrefuted testimony that they performed household work between 4:00 a.m. and late at night seven days a week. The evidence also established that Varsha sometimes gave out tasks that required the whole night to accomplish. Samirah testified that she was deprived of sleep, sometimes sleeping only two hours in a 24-hour period. Samirah testified that she never left the house alone, and Enung testified that she "didn't dare" leave the house due to Varsha's threats. Tr. 3188. Neither testified that any of their time, apart from the periods during which the Sabhnanis left the country for the summer, was free from responsibility.

The Sabhnanis, contrary to their position here, were not denied an opportunity to challenge the government's proposed calculation of the restitution award. In addition to considering sentencing memoranda, the district court held a hearing on July 11, 2008 at which the issue of restitution was addressed. At this hearing, the defendants were not permitted to examine the maids, but they did cross examine the government's witness from the Department of Labor who performed the calculations on which the government based its proposed award. The Sabhnanis thus had ample occasion to challenge this witness's knowledge of the facts of the case and the basis for his figures.

We conclude that the defendants were "afforded an adequate opportunity to argue [their] position" and that the district court did not abuse its discretion in declining to hold a full evidentiary hearing. *Maurer*, 226 F.3d at 152. "In determining the number of hours worked by a live-in worker, the employee and the employer may exclude, by agreement between themselves, the amount of sleeping time, meal time and other periods of complete freedom from all duties." 29 C.F.R. § 552.102(a). Here, the trial record established that there was no "agreement" between the Sabhnanis

and the maids as to periods of free time. To the contrary, the testimony was that at no time were Samirah and Enung afforded "periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits." *Id.* The trial testimony further demonstrated that the maids did not habitually get "a reasonable night's sleep"; in such cases, Department of Labor regulations suggest that "the entire [sleeping] period" should be counted towards the number of hours worked. 29 C.F.R. § 785.22. The district court did not err, much less abuse its discretion, in concluding that the trial record shed substantial light on the number of hours worked and that a full hearing was unnecessary.

### 3. The District Court's Award of Liquidated Damages

Pursuant to 29 U.S.C. § 216(b), the district court calculated a "net back pay" figure for each of the maids and then doubled this figure to arrive at each maid's total award. Section 216(b) of the FLSA provides that "[a]ny employer who violates [§§ 206 and 207] . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The Sabhnanis argue that the § 216(b) liquidated damages provision does not apply to restitution awards under 18 U.S.C. § 1593. We disagree.

Section 1593 provides that a sentencing court shall order restitution in the "full amount of the victim's losses," which the statute defines to include "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." 18 U.S.C. § 1593(b)(3). The question here is whether § 216(b)'s provision for liquidated damages

counts as part of the "value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." *Id*. We think it does.

Three points are significant about the statutory language. First, § 1593's reference to FLSA does not limit the "minimum wage and overtime guarantees" that determine the "value" of the victim's labor solely to §§ 206 and 207, the specific provisions of FLSA setting out the definitions of minimum wage and overtime and when they apply. This suggests that statutory provisions other than §§ 206 and 207 are relevant in determining what FLSA's "minimum wage and overtime guarantees" are.[18] Second, § 216(b)'s double damages provision is triggered automatically by a violation of §§ 206 or 207, so that an employer who violates these provisions "*shall be liable* to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (emphasis added). Third, § 216(b) is explicitly and exclusively tied to violations of the minimum wage and overtime rules in §§ 206 and 207.

These points strongly suggest to us that the "value of the victim's labor as guaranteed under the minimum wage and overtime guarantees [of FLSA]," for the purposes of 18 U.S.C. § 1593, includes the liquidated damages mandated by § 216. The Sabhnanis have one principal argument to the contrary. Section 260 of FLSA provides that when an employer shows that the conduct giving rise to a FLSA violation was undertaken in good faith and that he had reasonable grounds for

---

[18] Indeed, the value of the victim's labor "as guaranteed under [FLSA's] minimum wage and overtime guarantees," 18 U.S.C. § 1593(b)(3), requires reference to § 216(b) itself, because it is this provision that by its terms guarantees to the employee not only liquidated damages, but the minimum wages and overtime compensation that an employer has failed to pay. 29 U.S.C. § 216(b) (noting that any employer who violates §§ 206 and 207 "shall be liable to the employee" for unpaid minimum wages, unpaid overtime compensation, and liquidated damages).

65

believing that his conduct was not unlawful, "the court may, in its sound discretion" lessen or dispense with the liquidated damages award. 29 U.S.C. § 260. Based on this provision, the Sabhnanis contend that a liquidated damages award is not part of the value of the victim's labor that FLSA guarantees, but is in the nature of a penalty imposed on some employers for willful non-compliance.

This argument is without merit. As we have said with regard to FLSA's liquidated damages provision in the past, "[l]iquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999); *see also Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707 (1945) (noting that FLSA's liquidated damage provision "is not penal in nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate"); *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942) (same). The possibility that a judge may in narrow circumstances relieve an employer of its obligation to pay alters neither Section 216's general command that liquidated damages be paid nor our repeated recognition that these damages count as compensation. *See Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997) (noting that FLSA's liquidated damages "are considered compensatory rather than punitive"); *see also Herman*, 172 F.3d at 142 ("double damages [are] the norm and single damages the exception").

Finally, the defendants argue, citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), that they are entitled to a jury trial before liquidated damages may be awarded. In *Brock*, this Court determined that in suits by the Secretary of Labor or an employee for back wages and liquidated

66

damages under 29 U.S.C. §§ 216(b) and (c), an employer is entitled to a jury trial on the issue of the amount of back pay due pursuant to the Seventh Amendment. *Brock*, 840 F.3d at 1063 (citing *Lorillard v. Pons*, 434 U.S. 575, 580 & n.7 (1978)). Suffice it to say that the issue of whether an employer has a Seventh Amendment right to a jury in a civil case in which an employee or the government is seeking back pay and liquidated damages is analytically distinct from the question whether a criminal defendant who is required by statute to pay restitution is entitled to a jury trial under the Sixth Amendment on the amount of restitution due. This court has already held that the answer to the latter question is "no" in the context of awards made pursuant to other restitution statutes. *See United States v. Tin Yat Chin*, 476 F.3d 144, 147 (2d Cir. 2007); *United States v. Reifler*, 446 F.3d 65, 118-19 (2d Cir. 2006). We see no reason why these decisions should not apply here. For these reasons, the award of liquidated damages was proper. On remand, in calculating the new restitution award, the district court may award liquidated damages pursuant to FLSA § 216.

### D.  Property Forfeiture

After the jury returned its verdict as to the criminal charges, the government sought forfeiture of the Sabhnani's home pursuant to 18 U.S.C. §§ 1594 and 982(a)(6)(A). Section 1594 provides, in relevant part:

> (d) The court, in imposing sentence on any person convicted of [an involuntary servitude offense] shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person shall forfeit to the United States --
> > (1) such person's interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation
> > . . . .
> (e)(1) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
> > (A) Any property, real or personal, used or intended to be used to commit or to facilitate the commission of any violation of this chapter.

67

Section 982(a)(6)(A) further provides:

> The court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate [*inter alia*, the harboring offense] . . . if committed in connection with passport or visa issuance or use, shall order that the person forfeit to the United States, regardless of any provision of State law--
> . . .
> (ii) any property real or personal --
> . . . (II) that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted.

Pursuant to Fed. R. Crim. P. 32.2(b)(1), the district court determined that the entire house, including Mahender's attached office, was subject to forfeiture. After being charged, the jury deliberated and found as to both defendants that the government had proven by a preponderance of the evidence that the house was used "to facilitate the commission" of each of the crimes of which the Sabhnanis had been convicted.

Mahender raises two challenges to the forfeiture. First, he argues that the government did not prove that his office, which is annexed to the house, was used to facilitate the commission of the crimes and thus was subject to forfeiture. Second, he argues that the forfeiture of his interest in the home was grossly disproportionate to his culpability in the underlying crimes, and thus violated the Excessive Fines Clause of the Eighth Amendment. We review de novo a district court's legal conclusions regarding forfeiture. *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007). We review its factual conclusions for clear error. *United States v. Gaskin*, 364 F.3d 438, 462 (2d Cir. 2004).

1. Mahender Sabhnani's Statutory Challenge to the Forfeiture of the Office

Mahender makes two points with regard to the forfeiture of his office. First, he argues that the jury was improperly instructed that the forfeiture statutes allow for forfeiture of property even if

68

only part of the property was used to commit or facilitate the crimes. Second, he argues that his office was outside the scope of the applicable forfeiture statutes because it was not part of "the actual property" used to commit or to facilitate the Sabhnanis' offenses. Mahender's Br. 83.

We, like the district court, reject the premise of Mahender's argument — specifically that the office is a separate piece of property from the house itself and that the district court therefore should have determined separately whether it was subject to forfeiture. The office is not detached or separate from the house, and it is not separately owned; nor does it have a separate address. *United States v. Sabhnani*, 566 F. Supp. 2d 148, 156-57 (E.D.N.Y. 2008) (district court's forfeiture opinion). There is no separation of the office from the main house, as it is accessible directly from a kitchen within the house. The only evidence in the record that would arguably support the contention that the office is "separate" property is Deborah Litras's statement that the office is accessible via a separate entrance from the outside of the residence. Litras went on to testify, however, however, that the office can be accessed from the house by a single door. The district court did not err, therefore, in submitting to the jury the question whether the house as a whole was subject to forfeiture.

Even if we accepted Mahender's invitation to subdivide the parts of the Sabhnanis' house and determine whether each of them was separately subject to forfeiture, moreover, we have no difficulty concluding that the office was "used or intended to be used to commit or to facilitate the commission of" the crimes. 18 U.S.C. § 1594(d)(1). Under Fed. R. Crim. P. 32.2, the court may determine whether a property is subject to forfeiture "based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), including testimony at the earlier trial. The testimony at trial establishing that Samirah and Enung cleaned the bathroom of the office on Mahender's instructions, washed the office floor, and served Mahender drinks in the office, demonstrates that some of the labor the maids were

69

forced to do took place in the office. Moreover, because the maids were "concealed" within the residence and they entered the office on occasion, the office was also used to "conceal" them in violation of the harboring statute. Consequently Mahender's office was used to commit the crimes at issue, and it was properly included in the forfeiture.

2. Mahender Sabhnani's Constitutional Challenge to the Forfeiture

Mahender next argues that forfeiture of his entire interest in his home is in gross disproportion to his role in the crimes, in violation of the Eighth Amendment's prohibition of excessive fines. U.S. Const. amend. VIII. In evaluating such a claim, we determine whether the forfeiture is "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).[19] We do so by considering "(1) the harshness . . . of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct; (2) the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use; and (3) the culpability of each claimant." *von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007) (citing *Bajakajian*, 524 U.S. at 337-40). The district court, in rejecting Mahender's constitutional challenge, found that the "essence" of the defendants' crimes was the "harboring [of] illegal aliens and forcing them to perform domestic labor." *Sabhnani*, 566

---

[19] Although not all forfeitures are "fines" for the purpose of the Excessive Fines clause, those that can be characterized as punitive are "fines" subject to the limitations of the Eighth Amendment. *See Austin v. United States*, 509 U.S. 602, 609-10 (1993) (noting that Excessive Fines Clause limits the government's ability to extract payments as punishment for an offense, whether those payments are sought in civil or criminal proceedings); *see generally von Hofe v. United States*, 492 F.3d 175, 181-82 (2d Cir. 2007)

F. Supp. 2d at 155. The court determined that the Sabhnanis were clearly within the class of persons for whom the statutes at issue were designed, and that the statutes carried with them the possibility of severe punishment and large fines. *Id.* The trial testimony demonstrated, moreover, that the crimes of the defendants, all of which took place within the Sabhnani residence, caused great harm to the victims. *Id.*

Relying on *von Hofe*, Mahender argues on appeal that because he was less culpable for the crimes than was Varsha, the forfeiture of his interest in their jointly-owned home was excessive. In *von Hofe*, a husband and wife were convicted of state law offenses related to the growing of 65 marijuana plants in their shared residence, and the federal government thereafter sought forfeiture of the home. *von Hofe*, 492 F.3d at 179. The only crime to which Mrs. von Hofe pled guilty was possession of a controlled substance under Connecticut state law, while her husband pled guilty to manufacturing and distributing such substances. *Id.* We agreed with the district court that forfeiture of the husband's interest in the home did not violate his rights under the Excessive Fines Clause, *id.* at 186, but we reversed the forfeiture judgment as to his wife, *id.* at 188. Stating that Mrs. von Hofe bore "minimal blame for the criminal activity" that occurred at the house, we noted that there was no evidence in the record of her use of drugs or involvement in any way in the growing of the marijuana. *Id.* Indeed, there was no evidence that she even knew that marijuana was being trafficked out of her home. *Id.* at 188-89

We find *von Hofe* easily distinguishable. As we have already discussed, the trial testimony is clear that Mahender both knew of the criminal conduct taking place inside his residence and participated in it. This distinguishes *von Hofe*, in which we found it significant to her level of culpability that Mrs. von Hofe neither knew of the drug trafficking nor in any way "encouraged or

71

promoted" it. *Id.* at 188. In *United States v. Collado*, 348 F.3d 323 (2d Cir. 2003), we rejected a constitutional challenge to a forfeiture action against a building owner who was "willfully blind" to the drug trafficking taking place in her building. *Collado*, 348 F.3d at 327-28. Suffice it to say that if willful blindness is a sufficient level of culpability to justify a property forfeiture, Mahender's willful participation in the crimes taking place in his home fully supports the forfeiture judgment here. *See also United States v. Milbrand*, 58 F.3d 841, 848 (2d Cir. 1995) (forfeiture of mother's interest in farm on which son conducted marijuana trafficking was not excessive because evidence demonstrated that she must have known of criminal conduct taking place there). Given the evidence on which the jury relied to convict Mahender of the underlying criminal charges, there was nothing "grossly disproportionate" about the forfeiture of his interest in the house, and thus the forfeiture did not violate the Excessive Fines Clause.

**CONCLUSION**

For the foregoing reasons, we vacate the restitution award and remand for recalculation. We affirm the district court's judgments in all other respects. In light of the fact that we affirm on all issues related to the guilt and sentence of Mahender Sabhnani, he is ordered to surrender on April 5, 2010 to begin serving his term of incarceration. Mahender Sabhnani's current conditions of release on bail pending appeal will remain in effect until such time as he surrenders.